### DECCA LIMITED

v.

### The UNITED STATES.

No. 299–70.

United States Court of Claims.

July 9, 1976.

**1072**

Robert B. Russell, Boston, Mass., attorney of record for plaintiff; Henry C. Nields and Russell & Nields, Boston, Mass., of counsel.

Joseph A. Hill, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant; Paul F. Arseneau, Albert Sopp, Washington, D. C., Naval Electronic Systems Command, Dept. of the Navy, of counsel.

Before NICHOLS, KASHIWA and KUN-ZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended opinion, findings of fact and conclusion of law of former Trial Judge Cooper, submitted in accordance with Rule 134(h), in which he holds that the United States has infringed *within the United States,* claims 1, 4 and 11 of O'Brien, et al., United States Patent No. 2,844,816, and must pay reasonable and entire compensation under 28 U.S.C. Sec. 1498, the amount thereof being left to future proceedings under Rule 131(c). The alleged infringing device is the United States Government's worldwide Omega system for positioning ships and aircraft. The case has been submitted to the court on the briefs and arguments of counsel. Upon consideration thereof, since the court agrees with the said recommended

decision, except for one sentence, it adopts the same as the basis for its decision in this case, except for that sentence, which we have deleted.

We agree in general with the trial judge's handling of the extraterritoriality problem, but have eliminated a sentence to avoid giving the impression that we rely on what we believe to be the not unchallengeable proposition, that the territorial requirements of the United States Patent Laws are met simply because United States flag vessels or aircraft, receiving Omega signals while on or over the high seas, are ambulatory portions of United States territory. We think the territorial requirements of our laws are met otherwise in this case, so this juridical prop is not necessary.

The problem arises from the fact that, as held in *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), United States Patent Laws are territorial in their application and by their own terms are not infringed by acts in foreign countries that would be infringements at home. That case excluded shipment abroad of components of shrimp deveiners, for assembly there, although they had been held, when assembled at home, to infringe certain United States combination patents. The Court referred to provisions of the Patent Code, 35 U.S.C. Secs. 154 and 271, the former of which makes a United States Patent convey the right to exclude others from making, using, or selling the invention "throughout the United States" and the latter defines infringement as making, using, or selling the invention "within the United States". By Sec. 100(c) "United States" means "the United States of America, its territories and possessions". Patent claims, it was said, must moreover be construed strictly in light of "this Nation's historical antipathy to monopoly". 406 U.S. at 530, 92 S.Ct. at 1708.

It has several times been held that the fiction, as it has been called, that a United States flag vessel is United States territory, does not extend so far as to make general United States laws, enacted for territorial

application, and without express reference to shipping, applicable to United States flag ships at sea. *United States ex rel. Claussen v. Day,* 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758 (1929); *Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923); *Scharrenberg v. Dollar S.S. Co.,* 245 U.S. 122, 38 S.Ct. 28, 62 L.Ed. 189 (1917).

The parties, addressing this problem on inquiries from the bench, seem to have supposed the answer was primarily found in *Brown v. Duchesne,* 60 U.S. (19 How.) 183, 15 L.Ed. 595 (1857). In that case a United States Patent was held not infringed by a device carried as part of the equipment of a French flag vessel to a United States port, because, it was held, an implied exception to the United States Patent Laws existed for that particular situation. Congress could not by its general language have intended to empower patentees to harass and obstruct foreign flag ships in our ports, fitted out in conformity to the patent laws of their own countries, and trading to our ports pursuant to treaties guaranteeing them equal access. That case is quoted and followed in *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 146, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), holding that United States Labor Laws do not apply to labor disputes on board foreign flag vessels during their temporary stays in United States ports.

In the situation of "flag of convenience" ships beneficially owned by United States nationals, but under foreign flags, the Supreme Court has had difficulty, whether and when to imply exceptions to United States Law of this kind. *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). Sometimes it does so, sometimes not, as these cases illustrate.

In *Gardiner v. Howe,* 9 Fed.Cas. 1157 (1865), the court held that a United States Patent could be infringed by use on board a United States merchant vessel on the high seas. The court took the view that the United States Patent Laws extended to any place under United States jurisdiction. In *Marconi Wireless Tel. Co. v. United States,* 99 Ct.Cl. 1 (1942), *affirmed in part, vacated in part,* 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943), order on remand, 100 Ct.Cl. 566 (1943), this court followed *Gardiner v. Howe,* which it deemed, with *Brown v. Duchesne,* the only available authority, to hold that the Marconi patents were infringed by a group of receivers made and used at the United States Naval Radio Station at the American Legation in Peking, China. Though not mentioned in the opinion, it is of course well known that the United States then enjoyed extraterritorial rights at that location. The applicability of these cases today, to the instant problem, may be deemed questionable, both from their apparent inconsistency with *Cunard S.S. Co. v. Mellon* and *Deepsouth Packing Co. v. Laitram Corp.,* both *supra,* and still more, because the definition of "United States" in 35 U.S.C. Sec. 100(c) was only added to the Patent Code by the 1952 revision. *See,* 2 U.S.Code Cong. & Admin.News (1952), p. 2394, at p. 2409. Before then the Patent Laws did not define their own scope in a manner that so plainly confined them to states, territories and possessions. We do not, however, disapprove or overrule *Gardiner v. Howe* and *Marconi Wireless.* We only rely on them lightly and with hesitation.

It might be thought—and was in the *Marconi* case—that an implied exemption of foreign flag shipping from United States Laws, even when in United States ports, might as a logical corollary demand a corresponding extension of the same laws to United States ships, even though at sea or in foreign waters. However, an exception to a statute is always easier to imply than an extension is. Any such proposed extension would have to be considered on the merits of the case. Of course, when Congress expressly and consciously legislates for shipping or aircraft, the problem vanishes: it is solely one of construing general statutes. In the case of the Patent Laws the canon of hostile interpretation mentioned in the *Deepsouth* case provides an

added obstacle to implying an extension of the United States Patent Laws to correspond to the exception implied in *Brown v. Duchesne.*

In view of the foregoing, we think a decision founded on the fiction that for purposes of the Patent Laws, United States ships and planes wherever found, are United States territory, would be founded on water. We think, however, that the question can be left open, and still we find enough other basis for concluding that the location of the infringement is within United States territory, not abroad as in *Deepsouth.*

■ The alleged infringing system, Omega, is fully described in the trial judge's opinion and findings. It is a worldwide United States Government system for broadcasting radio waves of a particular kind to be received on ships or aircraft by receivers able to receive and use them, to pinpoint the location of ships and planes on or over the sea. Loren does the same job, but Omega is expected to succeed it. The broadcasting equipment is designed and built by the United States Government. These are two stations in the United States, and at present one in Norway, but others in foreign locations are projected. Two stations are necessary for a line of position, and three for an exact fix, by the meeting of two lines. The receivers in the ships or planes read the signals into computers and read out exact information as to location. The United States Government does not necessarily provide the receivers, and they can be of a variety of designs. The system would be worth little if it did not operate worldwide, at least as an ultimate goal, so that, a receiver once installed, the ship or plane can use it to navigate anywhere. Of its very nature the system cannot be confined to one country, but we do not think it is without any territoriality merely because it operates in more than one country, and at sea. Its home territory is, we think, where the broadcast stations are, but if they are in more than one country, the location of the whole for purposes of the United States Patent Law is where the "master" station

or stations are, which is in the United States of America, and where all the stations are monitored, presently Washington, D.C. All stations broadcasting in the system have to be brought into exact synchronization with the United States stations. The receivers have to be programmed to receive and measure the time differences in arrival of signals and interpret these differences. Thus they are in a manner "slaves" just as the foreign stations are. We do not think that the necessarily scattered and changing position of receivers, with those actually functioning for the most part at sea, in or over the territory of no sovereign, have any necessary connection with the location of the Omega system for purposes of the United States Patent Laws. It is located in the United States. This analysis agrees with that of the Patent Office Board of Patent Interferences. *Rosen v. NASA,* 152 USPQ 757 (1966), holding that an invention concerning space satellites was reduced to practice in the United States because of the location of control stations here.

This view does not claim an extraterritorial effect for United States Patent Laws, as did the view rejected in *Deepsouth, supra.* Neither is there a probable conflict with the patent laws of other counties. It could perfectly well have been that the assembly of the shrimp deveiners, e. g., in Brazil, could have been of concern to the patent laws of Brazil, which might have provided different consequences for the assembly than the United States laws would have. Here, if a foreign country, host to a "slave" broadcast station, attempted to apply its patent laws to that station in a harassing way, we suppose it would be viewed like the attempted application of United States Law to the French ship in *Brown v. Duchesne.* It would be an anomaly, though not impermissible. The French were not given extraterritoriality there. Any foreign country that consents to the entry of any element of the Omega system into its territory impliedly consents also, it would seem, to abstain from any application of its own patent law that would interfere with the intended use. If it breached this implied understanding, the remedy would

be not to claim extraterritoriality but to remove the station.

At any rate, the whole Omega system must be deemed, at least for purposes of litigating the patent here involved, to be a unity and the location of that unity must be deemed to be in United States territory. Here it has planted several of its feet, and use of United States territory is indispensable to it. The location of facilities in some foreign countries is also essential to the plan, but the selection of any single other country is, apparently, not essential. Any one such country could readily be abandoned for another.

Therefore, it is concluded that the above stated patent claims have been infringed. The plaintiff is entitled to recover and judgment is entered to that effect.

The opinion, as modified, findings of fact, and conclusion of law of the trial judge follow.

### OPINION

COOPER, Trial Judge:

Alleging that the world-wide Omega navigation system sponsored by the United States is an infringement of claims 1, 4 and 11 of its O'Brien et al. Patent No. 2,844,816, plaintiff brings this action for reasonable compensation under 28 U.S.C. § 1498. Defendant resists the claim, contending that the patent is invalid because the disclosed embodiment is inoperative and because the disclosure does not meet the requirements of 35 U.S.C. § 112.[1] In addition, defendant maintains that the Omega system is not covered by any of the claims here in issue. Finally, to the extent that the case for infringement is based on equipment located in foreign countries, defendant maintains that the patent laws of the United States and, hence, 28 U.S.C. § 1498, extend only to the territorial limits of the United States and preclude recovery based on equipment in such countries.

For the reasons stated hereinafter, it is concluded that plaintiff has carried its bur-den of proving infringement of claims 1, 4 and 11. It is further concluded that defendant has not established invalidity of the patent on the grounds asserted, and that the extraterritorial issue raised by defendant does not preclude a finding of liability in this case.

### I

The technology here in issue relates to hyperbolic radio navigation systems wherein separate transmitting stations fixed at known locations send out radio signals that are sensed by a mobile receiver at a position remote from the transmitters. In hyperbolic navigation, the receiver measures the time difference in arrival of the radio signals, the time difference being a measure of the difference between the distances traveled by the signals. In this way, a line of position (LOP) on which the receiver is located can be identified. The system is referred to as hyperbolic because the lines of position, as shown on a navigation chart, are in the form of hyperbolas. These hyperbolic LOPs are described as the path traced by a point moved in such a way that the distances between it and each of a given pair of transmitters always differ by a constant.

In hyperbolic navigation, signals from at least three stations are necessary, the signals from one pair of the stations being used to identify one LOP and the signals from another pair of the stations identifying another LOP. The intersection of the two LOPs provides a position fix which pinpoints the receiver's location.

On hyperbolic navigation charts, adjacent hyperbolic lines define between them a zone or lane. If the radio signals from two stations are received exactly in phase with each other, this indicates that the receiver is on one of the hyperbolic lines. If however, the signals are out of phase, this indicates that the receiver is in between the hyperbolic lines, i. e., in one of the lanes. The problem with which both the '816 pat-

---

1. Defendant makes no contention that the claims are invalid under either 35 U.S.C. § 102 or § 103, having expressly waived those defenses.

ent and the Omega navigation system are concerned is one of ascertaining which of the lanes the receiver is in and where it is in that lane.

In the '816 patent, the width of the larger zones or lanes was chosen to correspond to 1f, *i. e.*, one hyperbolic line of position is separated from the next adjacent line by one-half cycle of the fundamental frequency. If, as is the case with the accused Omega system, the 1f frequency is 1.133 khz., the basic lane width, as measured on the base line between two stations, is 72 nautical miles.[2] Since hyperbolic navigation charts are conventionally based on 9f, at that frequency, the lane width is 8 nautical miles. Hence, the problem of lane identification is one of determining which 8-mile-wide lane the vehicle carrying the receiver is in and, also, where it is in that 8-mile-wide lane.

The '816 patent, and in particular, the embodiment of Figures 4, 5 and 7 thereof, proceeds on the assumption that the navigator knows where he is within ± 36 miles, that is, that he knows which group of nine 8-mile-wide lanes he is in but not where he is in that group. To resolve that problem, the '816 patent proposes to use signals of 9f, 10f and 12f sent from each of two transmitting stations A and B, the signals from each of the stations being transmitted in phase with each other. The transmission pattern of the signals is distinctively altered periodically so that the receiver can tell which of the stations it is receiving at any given time. At the receiver, the phase values of the 9f signals from stations A and B are stored and compared. The difference in phase of these two signals is proportional to the difference in time of propagation, and is indicative of the position of the receiver in a 9f lane. In other words, by phase comparing the two 9f signals, the receiver provides a readout, referred to in the patent as the "fine" control, which tells the navigator where he is in a lane 8 miles wide.

It will be appreciated that this still leaves the question of which 8-mile lane the receiver is in. To resolve that problem, the receiver of Figure 7 uses ÷ 3 dividers and mixers to develop a 1f signal from each of the two stations. This is accomplished, as to each station, by "beating" or subtracting the 9f and 12f signals to obtain a difference frequency or 3f beat signal, which notches a divider to produce from the original 9f signal a 3f output in phase with that original signal. Then, by beating the 9f and 10f signals to obtain a 1f difference signal, a second set of ÷ 3 dividers is notched to produce from the 3f signal a 1f signal which carries the same phase as the original 9f. This is performed in two separate channels of the receiver, one channel processing the signals from station A and another channel processing the signals from station B. The two 1f signals thus produced from stations A and B are then phase compared and the phase difference is reflected in what the patent terms a "coarse" control. The coarse control indicates the position of the receiver in a 1f lane, *i. e.*, a lane 72 miles wide or, stated otherwise a group of nine 8-mile-wide lanes.

Taking the two readouts together, the navigator is provided with a LOP which tells him which lane out of a group of nine lanes he is in and where he is in that particular lane. To establish a position fix, the '816 patent proposes a third station C which will provide a third set of 9f, 10f and 12f signals, and these signals are processed in a third channel of the receiver. Thus, the signals from stations A and B, when processed as described, will provide one LOP and the signals from stations A and C will establish a second LOP. Where the two LOPs cross, the position of the receiver is established.

At this point, and before discussing the Omega system, it is well to consider defendant's contentions concerning the invalidity of the patent. Defendant contends that the

---

**2.** Lane width may be expressed in various ways. Stating it in nautical miles always requires specifying the frequency and an understanding that the measurement is "on the base line." As used herein, reference to nautical miles (n. m.) is to be understood to refer to a measurement on the base line.

readouts from the '816 receiver are meaningless because they could refer to any one of an infinite number of hyperbolic isophase lanes. Further, it is contended that the action of the mixers and dividers destroys the phase integrity of the signals in the receiver and, lastly, that the transmitters disclosed in the patent are incapable of producing a stable pattern.

■ Defendant's evidence in support of these defenses is not persuasive and none of these contentions can be sustained. There is no doubt that the '816 receiver is limited in its lane resolution capability to an unknown of ± 36 miles. But so is the Omega system yet to be described. The important point is that the '816 patent does disclose a system which, within its defined limits, is operative to resolve lane ambiguity. The mere fact that the system has some drawbacks, or that under certain postulated conditions it may not work, or that better, more sophisticated, equipment has been developed which does a better job does not detract from the operability of the disclosed equipment to perform its described function.

Nor does the fact that in the "real world" radio waves are subjected to a variety of disturbances and aberrations alter this conclusion. As described in finding 8, the '816 receiver does provide some compensation for these aberrations and it is in response to this very problem that the patentees suggested using the three frequencies 9f, 10f and 12f. With these three frequencies, the patentees found they could cope with about three times the perturbation as with only two frequencies.

Quite clearly, inoperativeness is not established merely by showing that the particular disclosed embodiment for carrying out the principles of the invention is lacking in perfection. *Field v. Knowles*, 183 F.2d 593, 37 CCPA 1211 (1950). In this respect, it is worthy of note that a "raw" LOP, that is, one in which there has been no correction for the aberrations and unwanted effects encountered by the radio waves, still has utility for rendezvous purposes and it is precisely for this purpose that the accused

Omega system was designed to have the capability of producing similar readouts.

■ Nor is there merit in defendant's contentions respecting inadequacy of the disclosure. Based on the record in this case, there is no doubt that one of ordinary skill in the art would be able to understand the patent disclosure and, from that disclosure, using the skill of the art, could build an operative system. That is enough to satisfy the requirements of 35 U.S.C. § 112. *Bowser, Inc. v. United States*, 388 F.2d 346, 181 Ct.Cl. 834 (1967); *Trio Process Corp. v. L. Goldstein's Sons*, 461 F.2d 66, 74 (3d Cir. 1972), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262.

■ Accordingly, it is concluded that claims 1, 4 and 11 are valid.

## II

Considering now the accused Omega system, it is a very low frequency (VLF) radio navigation system in which eight transmitters are to be located at strategic locations around the world. At the present time, only three stations have been completed, two in the United States (Haiku, Hawaii, and La Moure, North Dakota) and one in Norway. When the system is completed, signals from these eight stations will provide all-weather navigational service throughout the world.

The hyperbolic radio navigation technique is basic to the Omega system; however, the system is designed to have capabilities beyond that. For example, a navigator equipped with a suitable receiver can also employ rho-rho (or range-range) navigation. This latter type of navigation employs a circular grid, instead of hyperbolic, and requires signals from only one station. Nonetheless, it is clear that both of the receivers accused to infringe, the AN/ARN–99 for surface and aircraft, and the AN/BRN–7 for submarines, use the hyperbolic mode for establishing an initial position. The ARN–99 can then go to a rho-rho mode but the BRN–7 remains at all times in the hyperbolic mode. In addition, both receivers have the capability to dis-

play, at any time, a "raw" hyperbolic LOP. Since the '816 patent is concerned only with hyperbolic navigation, the accused system will only be considered from that standpoint, it being recognized that the rho-rho capability is an additional feature of the ARN–99.

The Omega system is designed to use the latest, most modern and sophisticated equipment. At the Omega transmitters, atomic clocks in the form of cesuim beam standards are used to coordinate the transmissions from each station and to ensure that all stations are in synchronism with each other. Each station transmits signals of 9f, 10f and 12f in a distinctively altered pattern so that receiver is able to determine which station it is receiving and to synchronize itself with the incoming radio waves.

Each receiver consists of a three-channel radio receiving section and a computer section. The computer is a militarized general purpose digital computer that has been preprogrammed for Omega navigation. The navigator cannot change the program in the computer or, in any way, alter the routine of the computer. The radio receiver section consists of amplifiers, mixers and other component hardware by which the incoming 9f, 10f and 12f signals may be processed and converted to digital information which the computer can handle. This is done in each channel of the receiver by beating each of the incoming 9f, 10f and 12f signals against the output of a local oscillator to produce three separate intermediate frequencies (If), each of which carries the phase information of the respective 9f, 10f and 12f signals. This phase information is then converted into a series of electrical pulses representing binary digits that are fed into the computer section and stored in the memory core.

As with the '816 patent, the Omega receiver is able to determine its initial position only within ± 36 miles when it operates in the hyperbolic mode. In other words, the navigator must know which 72-mile-wide lane he is in and the receiver will then be able to determine, by a laning procedure, which of nine 8-mile-wide lanes it is in and where it is in that particular 8-mile-wide lane. That is achieved in the following manner, it being recognized that the described functions are actually performed by the computer through a process of "state vector" analysis to arrive at a determination of which 8-mile-wide lane the receiver is in. The 9f, 10f and 12f frequencies are "differenced," that is, the 9f and 10f signals from each of two stations are subtracted to develop a difference frequency of 9f, the 9f and 12f signals are subtracted to arrive at a 3f and the 10f and 12f signals are subtracted to arrive at a 2f. With a fundamental frequency of 1.133 khz., the basic frequencies of 9f, 10f and 12f define lanes 8, 7.2 and 6 miles wide, respectively, while the difference frequencies of 1f, 2f and 3f define hyperbolic lanes of 72 miles, 36 miles and 24 miles, respectively. The computer uses its stored phase information to make a phase comparison of the signals from the two stations at these difference frequencies to establish a position in the larger lanes. By using three frequencies, ambiguities in the position in the lane are resolved. The speed of the digital computer is such that it can difference the frequencies and make the phase comparisons a number of times in a matter of seconds. It then averages the results of its computations and arrives at a best estimate or determination of which 8-mile-wide lane it is in.

Having made that determination, the computer then switches from the difference frequency mode to the single frequency mode. In this mode, it compares the phase of a single frequency from each of two stations. For example, it will make a phase comparison of the 9f signals from stations A and B and since that frequency defines an 8-mile-wide lane, the phase difference is indicative of where the receiver is in the 8-mile-wide lane previously identified. Here again, the speed of the computer is such that it can perform the operation a number of times and average the results within seconds before producing a readout.

Once the receiver has established its position, it can then simply count the hyperbolic lanes as it crosses each one. If, at any time,

the operator wants to know his position, the receiver will, on command, display a "raw" hyperbolic LOP. That LOP consists of the current lane count, *i. e.*, the number of the 8-mile-wide lane which the receiver is in, and, by a phase comparison of the 9f signals as described above, a digital display of how far across that lane the receiver has progressed as of that moment. The accused receivers have the further capability to apply various programmed corrections to their calculations and to convert position determinations to a readout expressed in latitude and longitude.

### III

Turning to the issue of infringement, claim 1 is as follows:

A hyperbolic radio navigation system in which a position line is determined by indicating the difference in the time of propagation to a receiver of signals emitted from two stations in known spaced geographical positions, wherein three signals are emitted from a first station satisfying the respective phase conditions, given in radians of angle, $n_1\omega_0 t + a_1$, $n_2\omega_0 t + a_2$ and $(n_1 + 1)\omega_0 t + a_3$, and three signals are emitted from the second station satisfying the respective phase conditions $n_1\omega_0 t + a_1 + k$, $n_2\omega_0 t + a_2 + k$ and $(n_1 + 1)\omega_0 t + a_3 + k$, where $n_1$ and $n_2$ are integers, $\omega_0$ is $2\pi$ multiplied by a fundamental frequency in cycles per second, $t$ is time in seconds and $a_1$, $a_2$, $a_3$ and $k$ are constants, the transmissions being switched in sequence such that the signals of each frequency are transmitted from one station during intervals of the transmissions of the same frequency from the other station, and the transmission being distinctively altered periodically for synchronising switching means at the receiver with the switching of the transmissions and wherein the receiver comprises means for receiving the radiated signals, switching means which are synchronised by the distinctive alteration in transmission and which are arranged to separate the received signals from the two transmitters, and a phase difference indicator for indi-

cating the difference in time of propagation which indicator has a recurrence cycle of time difference indication equal, in seconds, to the reciprocal of the fundamental frequency, said indicator being operated by a fine control and a coarse control, said fine control being dependent on a pair of signals derived from locally generated non-interrupted signals, one of which is phase-controlled by only one of the signals received from said first station and the other by only one of the signals received from said second station and the coarse control being dependent on six received signals derived from the three different frequencies transmitted from each of the stations.

Defendant correctly urges that more than a literal response to the terms of this claim must be shown for plaintiff to make out a case of infringement. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898). Not only must that be demonstrated, but it must also be shown that the accused system does substantially the same work in substantially the same way to accomplish substantially the same result as the claimed system. *Marvin Glass & Associates v. Sears, Roebuck & Co.*, 448 F.2d 60 (5th Cir. 1971); *Dominion Magnesium Ltd. v. United States*, 162 Ct.Cl. 240, 320 F.2d 388 (1963).

With respect to the literal readability of claim 1 on the Omega system, this is set out in finding 19 and no useful purpose is served in repeating it here. Suffice to say that plaintiff has sustained its burden of showing, by a preponderance of the evidence, that the Omega system, with two transmitters such as those at Haiku and La Moure and with either the ARN–99 or the BRN–7 receivers, does respond to the literal language of claim 1.

Notwithstanding literal readability, defendant maintains that the Omega system does not employ substantially the same means to provide the same end result. In particular, defendant relies on the fact that a general purpose digital computer is used in Omega as compared to the analog arrangement disclosed in the patent; that the

computer is of a type used for many other purposes; that it is the computer software that actually performs the calculations from which lane identification is made and that this software is nothing more than a set of equations; and that the Omega receivers are capable of doing far more than the receiver disclosed in Figure 7 of the '816 patent.

■ Of course, the mere fact that one or more elements of an accused combination, in this case the computer, are susceptible of noninfringing uses does not mean that all systems employing those same elements avoid infringement. *LaSalle Street Press v. McCormick & Henderson, Inc.,* 445 F.2d 84, 94 (7th Cir. 1971). Hence, the testimony that the same general purpose computers are used in noninfringing systems employed on bombing missions is utterly irrelevant to the question of whether the computer, when combined with the other elements of the Omega system, infringes the navigational system of claim 1.

■ With respect to the contention that defendant's use of digital means distinguishes the accused system, it is to be noted that the claim is not, by its terms, in any way limited to the specific analog mechanism disclosed. Also, the specification contains no indication that it was the configuration or details of the particular apparatus disclosed that was considered by the patentees to be their invention. Indeed, as it is stated at col. 7, lines 4–6 of the patent, "there are many ways of constructing a receiver to give identical or equivalent information" to that achieved with the receiver shown in Figure 7. Nor is there either prior art which requires that the claims be limited to the apparatus disclosed in order to preserve its validity, or proof that the doctrine of file wrapper estoppel requires such a limited construction of the claim. In short, the evidence supports the conclusion that it was a system which included a receiver capable of performing the functions of synchronizing itself with the transmitted signals, separating the signals, and producing from those signals a fine and coarse readout that was the invention, not the specific mechanism by which the receiver achieved those results. On these facts, infringement is not avoided by showing that digital instead of analog techniques are used in the accused system. *National Dairy Products Corp. v. Swiss Colony, Inc.,* 364 F.Supp. 134, 152 (W.D.Wis.1972).

■ Nor are defendant's arguments regarding the software any more persuasive. While *Gottschalk v. Benson,* 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) held that computer programs were not patentable per se, claim 1 is clearly directed to a combination of elements and not just to a program. Nor does claim 1, as applied to Omega, read only on the program in the computer. Indeed, as defendant's expert testified at trial, the program accomplishes nothing by itself; it must be mechanized to achieve the navigational functions for which the Omega system is designed. Thus, defendant's argument that the burst filter, the tracking filter and the Kalman filter by which the Omega computer processes the data are "mere abstractions" having no "physical" existence is entirely beside the point. The theory on which, for example, the Kalman filter, is based, and the instructions or program for the computer itself, may be nothing more than a set of equations, but the means for receiving the signals and processing them and the means for performing those instructions and achieving the end result quite clearly have a tangible, physical existence which meets the terms of the claim.

■ Nor can any weight be given to defendant's arguments regarding the sophistication of Omega as compared to the '816 embodiment. As defendant points out, digital computers were not really available in 1954 and the Kalman filtering process was not even developed until 1960. And there is no doubt that the Omega system, with atomic clocks and computerized operation, is able to provide for more accurate readouts of position than would have been achieved with the embodiment of Figure 7 in the patent. However, merely because the accused system is an improvement over the patented system does not mean that it

does not also infringe the patent. *Eastern Rotorcraft Corp. v. United States,* 184 Ct.Cl. 709, 397 F.2d 978 (1968).

What is controlling here is that the Omega system, when operating in the hyperbolic mode, uses the basic system that was the contribution of the patentees in the '816 patent. Thus, 9f, 10f and 12f signals are radiated in phase in a distinctively altered pattern and sequentially switched from two spaced transmitters; the distinctive pattern of the transmissions is used to synchronize the receiver with the sequence of the transmission; the signals are received and they are separated into separate processing channels; and indicator in the form of an LOP readout is provided, with the readout displaying a "coarse" position and a "fine" position; the fine position is dependent on the received and stored 9f signals and a phase comparison of those two signals; and the coarse position is obtained by frequency differencing the 9f, 10f and 12f from each of the two stations and a phase comparison of those signals. That is the system defined by claim 1, that is the patentees' contribution as defined by that claim and that is how Omega works. Having shown that by a preponderance of the evidence, plaintiff has met its burden. *Stamicarbon, N.V. v. Escambia Chem. Corp.,* 430 F.2d 920 (5th Cir. 1970), *cert. denied,* 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248.

Claim 4 is dependent on claim 1 and merely adds the requirement that the signals be radiated in sequence. Omega clearly does so, and for the same purpose, as in the '816 patent.

Claim 11, the only remaining claim asserted here, adds the limitation of a third transmitting station radiating signals satisfying certain specified phase conditions vis-a-vis the signals from the other two stations. The outputs from these three stations, taken in pairs, permit development of two intersecting lines of position and, therefore, a position fix for the receiver. For the same reasons as were discussed in connection with claim 1, it is concluded that the accused Omega system has a third station radiating signals as described and that the receiver can and does operate in the manner claimed.

Defendant, however, points out that the only station other than those located at Haiku, Hawaii, and La Moure, North Dakota, is in Norway and, hence, outside the territorial limits of the United States. Citing *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), defendant asserts that a claim is infringed only when an operative assembly of the entire claimed combination is made or used within the territorial limits of the United States. Defendant would have the court hold that since the third station required by the combination is in Norway plaintiff cannot show that the combination, as an operable assembly, was either made or used entirely within the territorial limits of the United States and that, therefore, there can be no liability under claim 11.

However, plaintiff is correct that *Deepsouth* really is not in point since that case dealt with a situation where the operative assembly of the claimed combination was completed and used wholly outside the United States. Here, only a portion of the claimed combination, one transmitter out of the requisite three, is located outside the United States while the beneficial use of the completed assembly actually occurs within the jurisdiction of the United States, when either a vessel or an airplane equipped with an Omega receiver and owned by the defendant receives and utilizes the signals in the manner claimed. Also, in *Deepsouth,* by the time the combination was assembled, all the elements of the combination had been sold and were in the hands of someone other than the domestic manufacturer. Here, all of the equipment in Norway was purchased by the United States, installed by the United States, continues to be owned by the United States, was operated initially by the United States and it operates today for the benefit of the United States under the direction and control of the United States. On these facts, *Deepsouth* cannot be considered to be controlling here.

The question thus presented is whether the system of claim 11 has been made or used, as those terms are employed in the patent law, by or for the United States. Stated more factually, the issue is whether, despite the third station being located on sovereign Norway soil, the United States can be said to have either made or used the claimed system in the United States.

■ Neither party has cited any cases dealing with the precise question presented and it appears to be one of first impression. Plaintiff suggests that some guidance can be derived from tort principles since patent infringement is a technical tort. In particular, plaintiff contends that, on the issue of which law to apply, the traditional rule is that a tort occurs when it is completed, where the last act occurs, even if part of the action leading up to it takes place elsewhere, or where the injury is sustained. Under that analysis, plaintiff urges that the tort of infringement was completed, and the injury sustained, when the receiver in the United States received the signals from all three transmitters. Accordingly, plaintiff urges that the infringement occurs in the United States. However, as defendant points out, it is settled that Governmental use of a patented invention is viewed as an eminent domain taking of a license under the patent and not as a tort, *Crozier v. Krupp,* 224 U.S. 290, 308, 32 S.Ct. 488, 56 L.Ed. 771 (1912), so the tort analogy is imperfect at best. Yet an analytical approach based on an eminent domain theory produces results similar to plaintiff's tort analysis. From the standpoint of a "use" by the United States, a cause of action under § 1498 arises when the accused equipment is first available for use, *Regent Jack Mfg. Co. v. United States,* 337 F.2d 649, 167 Ct.Cl. 815 (1964), and it is when the use occurs that a license is considered to have been taken. *Irving Air Chute Co. v. United States,* 93 F.Supp. 633, 117 Ct.Cl. 799 (1950). It is this taking of a license, without compensation, that is, under an eminent domain theory, the basis for a suit under § 1498. Here, it is when the receiver receives the signals in the United States that there is a completed use of the system. From a tort viewpoint, that is when the "injury" is sustained and from an eminent domain analysis that is when the license is taken.

Neither analytical approach, however, leads inexorably to a conclusion that claim 11 has been infringed. The plain fact is that one of the claimed elements is outside of the United States so that the combination, as an operable assembly, simply is not to be found solely within the territorial limits of this country. But there is no doubt that, to the extent possible, the system was made in the United States. By its very nature, the system has to have transmitters located outside of the territorial boundaries of this country, and it is necessary in installing those foreign transmitters to construct certain aspects, *e. g.,* the radiating antenna and the helix coil, on site. It is also worth noting that the final steps to achieving an operable assembly of the system as a whole took place in the United States. Thus, before the Norwegian station could transmit, it had to be synchronized with the United States stations. This was accomplished by flying an atomic clock from North Dakota to Norway and, by using the epoch pulse of the clock, the Norwegian station was placed in phase with the United States stations. Then the atomic clock was flown back to the United States to be checked for any impermissible drift. It was only at this point that the three transmitters could be said to be an operable assembly radiating signals in the required phase relationship. Finally, the last element and the final link in a complete and operative system, a receiver having a phase difference indicator actually receiving and processing signals in the manner claimed, is in the United States.

Analyzed from the standpoint of a use instead of a making by the United States, a somewhat clearer picture emerges. The transmission from the Norwegian station is controlled by the United States in the sense that it established and continuously monitors the signals from that station, and this all occurs in the United States. In addition, defendant established through the use of atomic clocks, as previously described, the

necessary synchronization of that station and part of that activity occurred in this country. Further, it is from the United States all actions are taken to ensure synchronization of the transmissions of that station with those in the United States. In other words, it is obvious that, although the Norwegian station is located on Norwegian soil, a navigator employing signals from that station is, in fact, "using" that station and such use occurs wherever the signals are received and used in the manner claimed.

In view of the foregoing, and while the matter is not free from doubt, it is concluded that a basis for liability under claim 11 has been shown. This conclusion does not rest on any one factor but on the combination of circumstances here present, with particular emphasis on the ownership of the equipment by the United States, the control of the equipment from the United States and on the actual beneficial use of the system within the United States. In addition, one other consideration that should be mentioned is that it is clear from both the specification of the patent and the claim that the patentees' contribution was not in the manner by which a transmitter generated and radiated the signals, but rather it was in a system in which signals having a particular relationship were received from spaced sources and utilized in the receiver to arrive at a position fix. Had it been otherwise, that is, had the invention dealt with the generation of the signals themselves, it seems clear that utilization of those signals in this country would only have been incidental and that operation of the Norwegian station would have been beyond the reach of the U.S. patent laws. As it is, the result reached is believed to be consistent with the patentees' true contribution and serves to secure to them their just reward for that contribution.

Finally, in treating the extraterritorial issue, the parties have included all of the transmitting stations in their arguments. However, the one in Norway is the only one that need be considered to resolve the question of liability under claim 11. What the situation may be, either with respect to the other stations or the equipment purchased by the defendant but not yet installed is a matter properly to be considered in the accounting, should it be relevant.

In conclusion, claims 1, 4 and 11 are valid and infringed and plaintiff is entitled to recover reasonable and entire compensation.

## FINDINGS OF FACT

1. Patent No. 2,844,816, entitled "Radio Navigation Systems" issued July 22, 1958, on an application Serial No. 492,592 filed on March 7, 1955, by William J. O'Brien and Harold G. Hawker. Priority is claimed on the basis of an application filed in Great Britain on March 8, 1954. Ownership of the patent rests in plaintiff, a corporate subject of England, domiciled in London, England. Claims 1, 4 and 11 are the only claims in issue.

2. The patent in suit herein referred to as the '816, relates to a system of radio navigation in which a plurality of transmitters transmit(s) a sequence of segments of continuous-wave (CW) radio signals, employing three specific, harmonically related frequencies, to be received on the "vehicle to be navigated," adapted to receive the signals separately and process them so as to determine the vehicle's navigational position by making a phase comparison of signals. The invention is particularly concerned with hyperbolic radio navigation systems in which separate transmitting stations fixed at known locations send out radio signals which are sensed by a mobile receiver at a position remote from the transmitters. The mobile receiver measures the time difference in arrival of the radio signals, the time difference being a measure of the difference between the distances traveled by the signals. In this way, a line of position (LOP) on which the receiver is located is identified. The system is referred to as hyperbolic because the lines of position are in the form of hyperbolas. Such a hyperbolic LOP would be the path traced by a point which moved in such a way that the distances between it and each of a given pair of transmitters always dif-

**1084**

fer by a constant. By establishing a second line of position based on signals from a second pair of stations, the intersection of the two provides a position fix which pinpoints the receiver's location.

3. (a) The particular problem to which the '816 patent is directed is what is known as "lane resolution" or "lane identification." In a hyperbolic system, adjacent hyperbolic lines define between them a zone or lane. Lane identification is concerned with the problem of finding which lane or zone the receiver is in out of a group of lanes. In the '816 patent, the width of the larger zone or lane was chosen to correspond to 1f, *i. e.,* one hyperbolic line of position is separated from the next adjacent line by one-half cycle of the fundamental frequency. This zone width can be expressed in various ways. Stating it in nautical miles always requires specifying the frequency and an understanding that the measurement is "on the base line" because hyperbolic lanes widen as they separate from the base line

drawn between two radiating stations. A more accurate and generic way to define it is to employ units which depend on phase difference because such a definition is accurate regardless of where the receiver is relative to the base line. Since the difference in phase of the two signals is actually proportional to the difference in time of propagation, albeit in different units, the 1f lane can be expressed as a time difference indication rather than a phase difference.

(b) If, as is the case with the accused Omega system, the 1f frequency is 1.133 khz., the basic lane width, as measured on the base line, is 72 nautical miles. At a frequency of 9f, the lane width is 8 nautical miles. Hyperbolic navigation charts are conventionally based on 9f so the problem of lane identification is one of not only determining which 8-mile lane the vehicle is in but also where it is in that 8-mile lane.

4. (a) The basic system contemplated by the patent is, in block diagram form, as follows:

(b) The patented system contemplates at least two stations, A and B. The transmitters of both stations are identical except that, to ensure synchronized radiation of their signals, the operation of station B is controlled, in a master/slave relationship, by station A. The transmitter produces output signals of 9f, 12f and 10f, by generating higher integral harmonics of a low basic fundamental frequency. A conventional audio oscillator constructed to generate a sinewave output signal of the funda-

mental frequency 1f, is connected to drive or actuate a 1f "Pipper." The pipper generates a repetitive wave train comprised of a series of very short, narrow pulses. These pulses, which are very rich in harmonic content, contain essentially all of the odd and even harmonics of the 1f input signal. The transmitter also includes three very sharply tuned amplifiers, and these are used to extract the 12f, 10f and 9f harmonics, respectively, from the spectrum of frequencies which appears at the output of the 1f

pipper. The output of the power amplifiers is commutated out onto the antenna by means of a rotory switch provided with a rotor element which is driven by a synchronous motor. The rotory switch includes a set of conductive arcuate segments, each of which is sequentially engaged by the spinning rotor of the switch. As the rotor successively engages the arcuate conductive segments tied to respective power amplifiers, the harmonic signal· thus received is applied to the antenna. The phase of the outgoing 12f, 10f and 9f harmonic signals is compared to the corresponding outputs from the 1f pipper, by means of a phase

discriminator which compensates for any phase shifts that occur between the 1f pipper and the antenna.

(c) While two stations are shown in the block diagram, a third station would be required to obtain a position fix. This third station would also be in a master/slave relationship with station A and would function in the same manner as the other stations to radiate 9f, 10f and 12f signals to the receiver.

5. A suitable receiver as disclosed in the '816 patent, is illustrated in Figure 7:

Fig. 7.

The receiver system takes the form of a three-channel configuration in which transmitted signals of 9f, 10f and 12f are received. Incoming signals of 9f which successively impinge upon the antenna 19, are commutated into 9f memory oscillators 24, 27 and 28. Each of these memory oscillators "memorizes" the phase of the incoming signal from a given station, as a result of the action of a phase discriminator 23. The

discriminator 23 effectively phase-locks each oscillator respectively to the instantaneous phase of the incoming burst of 9f. By this means, a stored replica of the phase of the incoming carrier frequency from each of the three stations is retained, and available for signal processing after the transmission interval for the respective burst of 9f has ended.

The 9f signals generated by the memory oscillator in each vertical tier are first applied to dividers 29, 30 and 31 to obtain a 3f signal and then to another set of dividers, 32, 33 and 34, respectively, to derive a signal of frequency 1f. The dividers 29, 30 and 31 are under the control of a mixer 35 while the dividers 32, 33 and 34 are under the control of a mixer 38. Each of the mixers 35 and 38, is supplied with a stored replica of the 9f signal, from the respective station, at the appropriate time. During the period when 12f is being received, the mixer 35 derives the "beat" frequency between 9f and 12f. The 3f output waveform of the mixer 35 thus derived is applied to one of the dividers 29, 30, 31 in the proper sequences. During the time interval when 10f is being received, the mixer 38 produces the "beat" frequency between 9f and 10f. The 1f output waveform of the mixer 38 is applied to the input of either divider 32, divider 33 or divider 34 at the proper time in the signal processing sequence.

The phase difference between the memorized replica of the 9f signal received from station A, and the memorized incoming signal from station B is observable on a fine phase indicator 41. The phase difference between the 1f frequencies developed by the dividers 32, 33 is rendered visually observable by means of a coarse phase indicator 42. The system also includes a fine phase indicator 43, and a coarse phase indicator 44, connected between two other adjacent vertical channels in the receiver.

The incoming 9f signals from the three stations arrive at the receiver in sequence. As a result, means must be provided for commutating the incoming 9f signals into the particular memory oscillator intended to process signals from a specific station. As shown, oscillator 24 must always receive and memorize the phase of the burst of 9f arriving from station A, oscillator 27 must sense and store the phase of the incoming burst from station B, and oscillator 28 must sample and phase-lock to the phase value associated with the incoming carrier burst of 9f arriving from station C. In order to commutate the sequentially arriving 9f signals into the correct oscillator, the system employs a rotary switch 26 which takes the form of a conductive rotor sequentially engaging three conductive arc segments. Each of the conductive arc segments is connected to the input of one of the 9f memory oscillators, in order to permit the spinning rotor to apply each of the incoming 9f signals to the appropriate memory oscillator. The rotor element of switch 26 is mechanically ganged to the rotor elements in a number of other switches. One of these switches is used to commutate the output signal from the mixer 35 into the dividers 29, 30 and 31 during the correct time interval in the signal processing cycle period. The output signal from the mixer 38 is also commutated either into divider 32, 33 or 34 as required, by means of one of the switches which is ganged to the rotor of the switch 26. The position of the spinning rotor must be synchronized at all times with that of a spinning rotor which is employed at the shore stations (i. e., transmitters) to commutate 9f, 12f and 10f signals out onto the air. This is accomplished by a synchronizer 40a and a synchronous motor 25a, which act to ensure that the receiver and the transmitter are always precisely correlated.

6. The receiver shown in Figure 7 utilizes frequencies of 9f, 10f and 12f. Assuming a fundamental frequency of 1.133 khz., the basic navigation frequencies are 10.2, 13.6 and 11⅓ khz. Using these frequency values, the memory oscillators 24, 27 in the first two vertical tiers of the receiver are both memorizing the phase of incoming 10.2 khz. signals. The fine phase indicator 41 will provide an indication of the phase difference between the two incoming 10.2 khz. sinusoidal signals. The frequency of the output signals produced by the first divider in each tier will be 3.4 khz. A phase indica-

tor connected between these two dividers 29, 30 would read the phase difference between the two 3.4 khz. sinusoidal analog waveforms. The lowermost dividers 32, 33 supply input signals of 1.133 khz. to opposite sides of a coarse phase indicator 42.

The readout on coarse phase indicator 42 corresponding to the 1.133 khz. wave length would represent a position in a 72-mile-wide lane. The indications which appear on the phase indicator 42 are nine times "coarser" than those which appear on the fine phase meter 41. The values which appear on coarse phase meter 42 are indicative of a position in a 72-mile-wide lane on a hyperbolic grid, and those of fine phase meter 41 are indicative of a position in an 8-mile-wide lane. Together, the meter 42 identifies which of nine lanes, each 8 miles wide, the receiver is in and meter 41 indicates the position within the particular 8-mile-wide lane.

7. VLF energy radiated out to a remote receiver is susceptible to many variations between the time it leaves the transmitter and the time it is received at the receiver. Such things as earth surface conductivity, diurnal variations and many other factors which vary from place to place over the earth's surface will have an effect on a radio wave. In addition, aberrations of unknown origin and unpredictable duration are also encountered and either effect the radio wave or may interfere with any reception of the signal. As a result, although signals may be phase-locked when transmitted, they may be out of phase due to factors other than the time difference of propagation by the time they are received.

8. (a) The '816 system has a limited capability to provide lane identification in the presence of noise and propagation error. It does so in the following manner. The 9f signals are fed respectively to the phase-locked oscillators 24, 27 and 28. These oscillators are driven by the incoming 9f signals and, therefore, they effectively "track" the 9f both as to frequency and phase, and, since their output is a clean, "noise free" signal, they are referred to as "tracking filters." Adequate tracking filters, such as

oscillators 24, 27 and 28, were known in 1954 and were capable of producing relatively clean signals. The fine control is then obtained by phase-comparing these signals at meters 41 and 43. The coarse lane identification is accomplished by two stages of controlled ÷ 3 division as follows. Referring first to signals from the A station by itself, the 9f output from oscillator 24 is divided by 3, by divider 29, and again by 3, by divider 32. The outputs of dividers 29 and 32, however, would be ambiguous if they were not further controlled. Thus, the divider 29 can be driven by any one of each third cycle of oscillator 24, and divider 32 can be driven by any one of each third cycle of divider 29, and without further control the precise cycle which is to do the driving is arbitrary. The way it is controlled in the '816 is first by developing a 3f signal from beating the 9f and 12f signals from station A at mixer 35. The 9f used for this is the output of the oscillator 24 which, in effect, is a stored representation of the 9f from station A. The 12f used is the 12f output of amplifier 21.

(b) The developed 3f beat signal is injected into the divider, and comprises an overriding or "notching" 3f signal which can effectively cause the 3f output to move over so as to receive its driving force from a different cycle of each group of pulses of the train. This shifting, however, will not take place unless the injected 3f signal is more than 60° out of phase with the previously existing 3f output (or 180° out of phase with the 9f). If the injected 3f is 60° or less out of phase, after the injected 3f goes off, the divider will move back and resume its alignment with the same cycle of the 9f group as before, just as though the 3f signal had never been injected.

(c) The same thing happens in the next division from 3f to 1f. Thus, if an overriding or "notching" 1f signal is injected into the divider (e. g., divider 32) which is more than 60° out of phase with the existing 1f output of the divider (or 180° out of phase with the 3f), the divider will move over so as to be driven by a new one of the 3f pulses. And if the injected 1f is 60° or less

out of phase, the 1f divider will move back and resume its alignment with the same 3f pulse it was on before.

(d) In this way the dividers 29, 30, 31, 32, 33 and 34 are controlled or "notched" under the influence of all three transmission frequencies from each station to cause the coarse phase indicators 42 and 44 to be driven in correspondence with a given notch of the 9f, thereby permitting the coarse meters to be calibrated so as to read out the whole number of the lane. Once the "notching" is correctly established, the dividers effectively store the lane information for periods during which the 10f and 12f signals are not on. In fact, the system will "integrate" indefinitely without the 10f and 12f as long as the 9f is not interrupted long enough for the tracking filters to wander too much. Oscillators in use in 1954 were good enough to tolerate 5 minutes' silence on the 9f without loss of lane provided straight and level flight was assumed. In fact, if the 9f skips a lane or two in a period of no signals, when the signals come back on the air, the 12f and 10f, when employed separately in the foregoing manner to produce the notching 3f and 1f signals respectively, will return the coarse meter 42 back so that it will read out the correct 9f lane provided the undetected drift does not exceed 4½ 9f lanes during the period of no signals (i. e., ± 36 n.m.). Similarly, a short term random aberration in the signals can cause an erroneous lane reading, but after the aberration passes, the system will return to accurate navigation in the same way.

(e) The same considerations are applicable to long term aberrations resulting from, for example, diurnal variations of frequency dispersion. If, as an example, there is an aberration in the 9f signal from station A, the divider 29 will be driven by the 9f and the aberration will also appear in the output of the divider 29 with the 3f exactly in alignment with the driving cycle of the 9f. At mixer 35, the incoming 12f is assumed to be without error. This means that the only erroneous phase shift is in the 9f and when the 9f and 12f from station A are mixed

(heterodyned) the erroneous phase shift will carry through without change into the beat note, and the 3f output of mixer 35 will be in error by an amount dependent on the magnitude of the original aberration. Such an error in the 3f, however, is immaterial if it is short of the 60° in the 3f noted above which is required to shift the 3f output of the divider 29 to a different driving cycle of the 9f. Assuming that it is, after the 12f goes off, the divider 29 will remain in the same "notch," just as if the mixer 35 had not injected any signal. Similarly, the divider 32 (which is driven by the output of divider 29) remains unchanged after the departure of the transient signal from mixer 35.

The same analysis applies to the next level of division from 3f down to 1f. Here the injected 1f signal from mixer 38 comes in after the mixer 35 goes off, and as above, it must likewise be more than 60° out of phase with the output of divider 29 on the 1f scale (or more than 180° out of phase on the 3f scale) to cause divider 32 to adopt a different one of the three pulses from divider 29 as its driving force.

In the '816, the 1f difference frequency (i. e., the beat note of the 9f and 10f at the output of mixer 38), is used only to identify which notch of the 3f is the correct one. This means that it can tolerate substantially more (i. e., three times the aberration) without throwing the system into error than would be the case if only the 1f difference frequency were used to identify the 9f notch. A 9 to 1 system can tolerate no more than 20° aberration in the 9f; however, in the '816 by use of the 3f difference frequency (i. e., the beat note of the 9f and 12f at the output of mixer 35), the correct 9f notch can be identified first on a 1 to 3 basis in the presence of 60° aberration in the 9f, and the 1f can identify the correct 3f notch also on a 1 to 3 basis and also in spite of a 60° aberration in the 9f.

9. In summation, the '816 patent describes a hyperbolic radio navigation system wherein three phase-locked, harmonically related frequencies from each of two (or more) spaced stations, are transmitted and

received in a synchronized manner, and then processed in the receiver to provide a "raw" LOP comprising a fractional lane readout which is dependent on two of the signals (*i. e.*, the 9f from two stations), and a coarse readout of the whole number of the lane which is dependent upon the six received signals from two stations.

The receiver of Figure 7 is designed to tell a navigator, through the readout of meters 41 and 42, which lane out of a group of nine lanes the receiver is in and where in the particular lane the receiver is. If the navigator knows his position to an accuracy that places him in a group of nine lanes, the meters 41 and 42 will read his position without ambiguity. If the navigator does not know which group of nine lanes he is in, the patented receiver is not capable of supplying that information.

10. (a) A commercial Decca Decometer could be used for meters 41 and 42. The meters might display a "raw" (*i. e.*, uncorrected for aberrations, etc.) hyperbolic LOP in numeric or digital form. Defendant's contention that claim 1 requires that the readout must occur, or be updated, on a recurrent cycle which, in seconds, is the reciprocal of the fundamental frequency is in error. What is meant by the statement at col. 1, line 49, and the corresponding statement in claim 1, that the phase difference indicator would indicate "the difference in time of propagation which indicator has a recurrent cycle of time difference indication equal, in seconds, to the reciprocal of the fundamental frequency" is that the magnitude of the time difference of propagation indicated as the receiver passes through successive 1f lanes, will be the reciprocal of 1f. If, for example, the fundamental is 1.133 khz., as it is in the accused system, the time difference of propagation reflected by the meters would be 0.8824 milliseconds, as the receiver passes from one 1f lane to another 1f lane.

(b) The mathematical expressions in claim 1 of the '816 patent for the output signals radiated by the transmitters contain one or more radian constants. As explained at col. 11, line 9 and at col. 1, lines 33–39,

and as one of ordinary skill in the art would readily recognize, each frequency is harmonically related and each is locked in phase relative to the fundamental but the exact time relationship is unimportant so long as it stays the same. An arbitrary phase change may be made in the radiated signals so long as equal phase changes are introduced in the receiver. These arbitrary phase changes are recognized in the symbolic notation which expresses the phase relationships of the frequencies by the constants included in that notation. These constants may range from zero, *i. e.*, no arbitrary phase change, up to any value. In other words, the '816 patent recognizes that an arbitrary phase change may be introduced, the only requirement being that it be used uniformly throughout the system.

(c) The transmission hardware and alignment procedures of the '816 were standard for Decca at the time and the feasibility of the transmitter had been proven and was well-known prior to 1954. The use of VLF (in the 10–14 khz. band) on equipment such as that described in the '816 also was feasible in 1954. Although the embodiment of Figure 7 was never actually built and sold, the related structures of Figures 8 and 9 were. The reason why Figure 7 was not was due to the lack of Governmental authority to build and operate antennas suitable for VLF transmission. Such antennas are very large and their transmission interferes with nearby telephone transmission. Plaintiff, at one time, spent a large sum of money for equipment for VLF antennas on the expectation that the granting of such authority was imminent, but the expectation proved to be false and the plan had to be abandoned.

(d) Switching of transmissions was illustrated in the '816 by means of a rotary "commutator" switch. The '816, however, lays no stress on this form of switching. Any type of timed switching would do as well and comes within the purview of the '816 disclosure.

(e) The transmission pattern in the '816 is altered periodically for synchronization purposes. The patent, however, makes it clear

that other methods of synchronizing switching could be used (col. 5, lines 39–43) and that what was needed was some form of "modification of the transmission for signalling purposes" (col. 9, line 21) so that the receiver would be able to line up correctly in synchronism with the received signals.

(f) Since atomic clocks were not available in 1954 the transmissions in the '816 were performed in a Master/Slave relationship, with the precise timing of the slave transmissions being controlled directly by transmissions from the master. The '816 patent, however, lays no emphasis on this detail and its broad statements of the invention at col. 1, lines 27–44, and col. 3, lines 51–69, merely specify the phase and harmonic relationships and the need for synchronism. None of the claims in issue is limited to the specific Master/Slave relationship disclosed in the patents.

(g) The data processing in the '816 is strictly analog. Thus, the phase angle of the 9f from the A station is compared to the phase angle of the 9f of the B station and the meter 41 reads out the difference in a strictly analog manner. Likewise, the 3f and 1f "notching" signals perform their functions of developing the lane information which is then stored in the dividers and read out on meter 42 in a strictly analog manner. As of 1954, the man skilled in this art, for all practical purposes, had only analog means available to him.

(h) Plaintiff had long been aware of the existence of propagation aberrations of various sorts, and, by 1947, it was already publishing corrections to users of its navigation systems. The '816, however, was concerned with minimizing the effect of propagation aberrations on the accuracy of the lane identification and made no attempt to provide for correcting the fine control to compensate for propagation dispersion. Thus, the '816 provided a simple "raw" position based on crossed "raw LOP's." Such information can be employed for rendezvous purposes and known propagation errors can be applied to it for navigation. Also, the '816 equipment can be set up at a known location and an accurate correction

for propagation errors can be made at that time simply by comparing the readout of the equipment with the known position. Thereafter, if the equipment is monitored or used for a while, the predictable propagation errors can be established, at least on a temporary basis.

11. (a) Accused to infringe is the Omega VLF Navigational System sponsored by the U.S. Navy for world-wide use. That system contemplates Omega transmitters to be located at the following eight locations:

La Moure, North Dakota
Haiku, Hawaii
Bratland, Norway
Liberia
La Reunion Island (France)
Argentina
Tsushima, Japan
Australia

Agreements and/or treaties have been concluded with Norway, Japan, Argentina and Liberia under the terms of which stations may be installed in those countries.

(b) Defendant has procured all of the constituent elements for eight Omega transmitting stations, i. e., 16 transmitters, nine timing and control sets, and eight antenna tuning sets, otherwise designated as follows:

1. Omega Timing & Control Set AN/FRN–30
2. Omega Tuner AN/FRQ–18(V)
3. Omega Transmitter AN/FRT–88

By the time of trial, Omega transmitter stations had been completed, and were operating at La Moure, Haiku and Bratland, Norway, and construction was under way at La Reunion, Tsushima and Argentina. Equipment for stations not yet under construction is stored at Great Lakes, Illinois. The only parts of a complete transmitter system not stored at Great Lakes are the tower and a wound helix coil. The tower is purchased when the station is to be constructed and the helix coil is wound on site.

(c) Defendant has procured Omega receivers AN/ARN–99 and AN/BRN–7. The ARN–99 receivers are for use with surface and air craft while the BRN–7 receivers are for submarines. There appears to be no

dispute that these receivers have been installed in craft owned by the United States and that these receivers have been used to receive signals both from any combination of two of the three operating Omega stations and from all three stations for navigational purposes, and that this has occurred both within and without the territorial limits of the United States.

12. The Omega system is designed to provide transmissions of 9f, 10f and 12f signals from eight stations spaced to provide worldwide coverage. Each of the stations includes three major components, the AN/FRN–30 Timing and Control set, the AN/FRT–88 Transmitter set, and the AN/FRQ–18(V) Tuning set for the transmitting antenna. The timing and control set includes a set of four redundant cesium beam frequency standards. These cesium standards are ultra-stable atomic clocks, which exploit the phenomenon of atomic resonance, and attain an accuracy of one part in $10^{11}$. The transmitter set includes audio power amplifiers, and the tuning set includes a number of relays, which may be selectively closed to direct the 9f, 10f and 12f to the proper tap on a helix coil from which they are commutated out onto an antenna system. The two types of mobile receivers, the AN/ARN–99 and the AN/BRN–7 complete the Omega system. The following block diagram illustrates the basic system:

13. (a) The Omega frequencies are in fixed multiple phase relation, and therefore are harmonics of a fundamental frequency f as follows:

10.2 khz. = 9 × 1.1–1/3 khz. = 9f
13.6 khz. = 12 × 1.1–1/3 khz. = 12f
11.33 khz. = 10 × 1.1–1/3 khz. = 10f

These three frequencies are phase-locked to Universal Time so that all three simultaneously cross zero phase with a positive slope at exactly 0000 hours. At the transmitters the necessary fixed multiple phase relation is obtained by dividing down and synthesizing from a higher frequency generated by the extremely stable atomic clock which has an output of 1 mhz. The 1 mhz. output is divided down to 816 khz., which is an integral multiple of the three Omega frequencies, and that signal is then subject-ed to a series of digital divisions to produce the correct values to be radiated from the antenna.

(b) The Omega pattern repeats itself with all frequencies rising through zero amplitude at the start of each 30-second epoch from zero Omega time, and a 30-second epoch pulse is used to bring them all into alignment at that instant. If any of the dividers in a given transmitting unit somehow loses phase alignment, as they can on occasion, a warning light comes on, the unit is shut down and the transmissions have to be realigned by the use of a new epoch pulse from another equipment. At the start-up of a new transmitting unit, the alignment is done by starting an atomic clock at an existing station and synchronizing its 30-second epoch pulse with that sta-

tion, then flying the clock to the new station and starting the transmitting units there with their clocks in synchronism with the 30-second epoch pulse from the original station. The clock is then flown back and checked to make sure that it is still accurate. At each station, there are four such clocks, and each is constantly being checked against the others. If one of the dividers in one unit loses phase alignment, a reference signal from one of the clocks immediately indicates an error and the unit with the error is automatically turned off and reset using the 30-second epoch pulse of one of the other units.

(c) The Omega transmitter system is designed to compensate for any change in antenna capacitance or detuning occasioned by weather changes, snow on the ground, wind forces, and a large number of other factors. Precise control is indispensable because any shift in the antenna capacitance results in a large drop in the radiated output power. A feedback control system samples the values of the current and voltage which are present in the antenna line and from these samples, corrections are made. The Omega system also constantly monitors the phase of the outgoing carrier bursts of VLF and corrects any error discovered. Provision is also made for checking the waveform at numerous points in the system.

(d) The Omega stations radiate their signals in a distinctively altered transmission pattern to facilitate station identification. This is accomplished by the transmission segments having slightly different durations, and the durations are coded so that a receiver can thereby identify each individual station.

14. (a) The basic Omega receivers are illustrated in the following block diagram:

(b) Each receiver uses a reference oscillator to measure the difference in phase between itself and the incoming CW bursts. This oscillator is not as precise as the atomic clock of the transmitting stations, and thus may drift. Also, when the Omega receiver is turned on the oscillator zero time is unknown. However, the fact that the receiver oscillator is not time-synchronized to universal time zero is unimportant, for either the measurements from two stations can be differenced, thus subtracting out the arbitrary oscillator zero time, or the error in receiver oscillator zero time can be calculated, and its drift measured and tracked, thereby permitting single station phase measurements. Position fixing by the first method, using two-station, difference meas-

urements, is referred to as hyperbolic navigation; position fixing by the second, which uses the phase measurements from each station is called circular or rho-rho navigation.

(c) The receivers are of a single conversion heterodyne design using an RF section in which amplifiers, filters and mixers are among the components making up the hardware. The output of these receivers are digital signals which are fed into a militarized general purpose digital computer. The computer is programmed to perform a whole host of functions including selection of the optimum orientation for the loop antenna, synchronization of the incoming signals with the computer routines, measurement of the phase of the incoming signals, compensation for the motion of the vehicle, prediction and compensation for imperfection in the received waves, compensation for the oblateness of the earth and conversion of data to latitude-longitude. Some of these functions are performed in the burst filter, some in the tracking filter and some the Kalman filter, all of these filters forming a part of the program stored in the magnetic core of the computer.

(d) A three-channel Omega receiver operating in the hyperbolic mode has the capability of resolving lane ambiguities up to 72 nautical miles. Operating in the rho-rho mode, it automatically computes circular lanes out to 144 nautical miles. The Omega system using the ARN–99 receiver uses what may be called a modified rho-rho method in that it determines its initial position by phase differencing the signals from three stations in the hyperbolic mode; thereafter, as the computer becomes more confident of the oscillator drift calculation, its operation approaches rho-rho where signals from a single station are all that is required. The BRN–7, however, makes no use of the rho-rho mode of navigation, and always requires signals from three stations to get a position fix and signals from two stations to establish a LOP. Both types of receivers, when operating in the hyperbolic mode, process the signals in the same way and both have the capability to display, at

any time, an uncorrected "raw" hyperbolic LOP.

15. The 9f, 10f and 12f signals or carrier bursts from the Omega stations must be synchronized with the receiver's own repetitive internal timing cycle which is cyclic and repeats itself once every 10 seconds. The importance of verifying synchronization is that the computer will not initiate the sequencing of any of its computational cycles, or correctly produce the myriad of critically-timed downstream gating impulses required by its logic circuitry, until it has determined where the leading edge of the incoming burst from the station is occurring with respect to its own repetitive 10-second cycle. The receiver uses a mathematical technique called differential correlation involving "short slot" and "long slot" sums to establish synchronization of the receiver's cycle with the incoming transmission. It is the periodic distinctive alteration in the transmission pattern that signals the receiver as to the correct timing of the sequence. The particular method by which the computer processes the incoming pattern of signals to achieve synchronization is immaterial.

16. As the 9f, 10f and 12f signals arrive at a receiver, they are heterodyned down to a common If or 1.1–1/3 khz. (this frequency choice is merely a convenient If frequency and bears no specific relationship to the If used in the navigational problem). The heterodyning, however, is done by mixing with locally generated signals having a fixed phase relationship. Therefore, the IF retains the phase relationships of the incoming 9f, 12f and 10f frequencies without change. Accordingly, when the different transmissions from the respective stations are phase-compared to a local oscillator oscillating at 1.1–1/3 khz., the respective phase relationships of all the incoming frequencies can be determined and measured. At this point, the phase information (*i. e.*, the difference in phase between the incoming signal reduced to 1.1–1/3 khz. and the local oscillator), is measured and the value is then translated into a series of electrical pulses representing binary digits which are

then fed into the computer where they are stored in the memory core in the form of discretely magnetized areas, the stored digital value of which represents the phase of the incoming signal. In this connection, the phase information remains continuously available for use by the computer according to its permanently maintained built-in program.

17. The manual for the BRN-7 describes the functions of the burst filter, tracking filter and Kalman (combinational) filter as follows:

3.1.1.4.7 *Burst Filter:* The function of the Burst Filter is to collect the sine and cosine receiver outputs and calculate the first crude phase measurement as well as an estimate of its credibility based upon the signal-to-noise ratio (from Noise Estimation). It is the combination of the Burst Filter processing and the correlators in the receiver which constitute that referred to as the correlator ratio detector. The resultant phase is corrected for phase errors introduced by the hardware. The measurements, phase, and estimate of validity are transferred to the phase differencing equations before submittal to the Tracking Filters.

\*     \*     \*     \*     \*     \*

3.1.1.4.10 *Tracking Filters:* Since there are eight possible transmitting stations and three frequencies for each station, there are 24 Tracking Filters. Each Tracking Filter receives an input from the phase differencing equations once every 10 seconds. After differencing, the input to the Tracking Filter consists of a measure of phase difference and a computed variance of this measurement. This measured phase difference is then compared (or weighted in a statistical sense) with an estimated value of phase difference which the Tracking Filter computes based upon previous measurements. From this comparison a new estimate of phase difference is computed.

\*   \*   \*

3.1.1.4.11 *Combinational (Kalman) Filter:* The outputs of the Tracking Filters are well-filtered value of phase differ-

ence along with the estimates of phase difference variance and phase difference rate variance. It is within the Combinational Filter operations that the outputs of the Tracking Filters are statistically, optimally combined, arriving at "best" error estimates of system position, velocity, and oscillator drift. The error estimates of system position are transmitted to the navigation equations as rotational corrections about the axes of the reference triad while the velocity error estimates are transmitted to Velocity and Heading Processing as corrections along the axes. The error estimate in oscillator drift measures the phase and frequency differences between the local oscillator in the receiver and the transmitted OMEGA signals.

The Combinational Filter is also used for lane determination. Lane determination (laning) is accomplished by use of a multiple state vector technique. The wavelength of each frequency determines a lane within which the receiver position can be determined. The widths of these phase difference lanes are 6, 7.2 and 8 miles, corresponding to the frequencies of 13.6, 11–1/3, and 10.2 khz., respectively. At intervals of 72 miles these lanes repeat, thus defining a larger three-frequency lane width. Resolving the known phase (position) from each frequency into the larger lane is referred to as resolving the lane ambiguity. A three-channel OMEGA receiving set operating in the hyperbolic mode has the capability of resolving lane ambiguities up to 72 nautical miles.

18. (a) Lane identification, for purposes of developing a raw hyperbolic LOP, is made in the Omega receivers by a process involving both frequency differencing and phase comparisons. The receiver computer has accumulated in its storage, within the synchronization period at the start, sufficient information about the phase and sequence of the incoming 9f, 10f and 12f signals from all received transmissions to be able to frequency difference them or to phase compare them as required. Natural-

ly, this information is constantly being updated with the passage of time and is available for determination of a raw hyperbolic LOP in the lane identification mode at any time after synchronization is completed. For each station by frequency differencing the 9f and 10f, 10f and 12f, and 9f and 12f in pairs, difference frequencies of 1f, 2f and 3f respectively can be generated. These difference frequencies from two different stations can then be phase compared so as to locate the receiver within the corresponding 1f, 2f or 3f zones, which on the base line between the two stations would have widths of 72, 36 and 24 miles respectively. This is "course" indication of receiver position within the 72-mile-wide zone (at the base line) corresponding to the Omega 1f fundamental frequency of 1.133–1/3 khz. The digital computer in the receiver performs these operations repeatedly and rapidly, ultimately determining the "course" lane identification, *i. e.,* locating the receiver in one of nine 9f lanes in the 1f 72-mile-wide zone.

(b) At this point, the computer will now take single frequency measurements on the 9f from the two stations and, by a phase comparison, determine where the receiver is in the previously identified 9f lane. When this has been accomplished, the receiver will display a digital LOP readout, as, for example, 985.75, the numbers to the left of the decimal being indicative of the 8-mile lane and the numbers to the right indicating the location as a percent of that 9f 8-mile-wide lane.

(c) Thus, the accused receivers are capable of resolving lanes to ± 36 n.m. based on receiving all three frequencies, 9f, 10f and 12f, from each of the stations. If the navigator does not know his position within ± 36 miles, the Omega system cannot supply that information. But assuming that he does, both types of receivers are programmed to display, upon command, a raw hyperbolic LOP which identifies which lane out of a group of nine the receiver is in and where the receiver is in that lane. It is by a process of differencing the frequencies and comparing their phases that the receiv-er arrives at a determination of which lane it is in. Through a phase comparison of the 9f signals, its position in that lane is ascertained.

(d) Both in determining its original position in a 72-mile lane, and at other times, the computer section of the receiver utilizes a mass of other data to arrive at a solution. For example, stored in the memory of the computer is such information as the coordinates of each Omega station and values of surface conductivity and correction factors which compensate for variations in the propagation velocity affecting the radiation path between each Omega ground station and the receiver. The computer is also constructed to receive, and utilize, velocity related rate-aiding signals, such as inertial velocity, doppler velocity, and true airspeed, as sensed by external sensors.

19. The Omega navigational system is readable on claim 1, as follows:

*Clause 1.*

A hyperbolic radio navigation system in which a position line is determined by indicating the difference in the time of propagation to a receiver of signals emitted from two stations in known spaced geographical positions,

Omega obviously employs the hyperbolic navigation technique to resolve the problem of lane identification. Both of the accused receivers are equipped to read out a raw *hyperbolic* LOP. This means that the position line is determined by indicating the difference in time of propagation to a receiver of signals emitted from two stations in known spaced geographical positions.

*Clause 2.*

wherein three signals are emitted from a first station satisfying the respective phase conditions, given in radians of angle $n_1\omega_0 t + a_1$, $n_2\omega_0 t + a_2$ and $(n_1 + 1)\omega_0 t + a_3$, and three signals are emitted from the second station satisfying the respective phase conditions $n_1\omega_0 t + a_1 + k$, $n_2\omega_0 t + a_2 + k$ and $(n_1 + 1)\omega_0 t + a_3 + k$, wherein $n_1$ and $n_2$ are integers, $\omega_0$ is $2\pi$ multiplied by a fundamental frequency in

cycles per second, $t$ is time in seconds and $a_1$, $a_2$, $a_3$, and $k$ are constants,

The phase conditions of Omega's 9f (10.2 khz.); 12f (13.6 khz.); and 10f (11–1/3 khz.) answer to the above analytical expression. They are transmitted in such a way that all frequencies cross zero amplitude, rising at zero Omega time which means that all of the constants in the above expression are zero. Nothing in the '816, however, requires these constants to have any particular value, all that is necessary is that they be constant. They are in Omega.

### Clause 3.

the transmissions being switched in sequence such that the signals of each frequency are transmitted from one station during intervals of the transmissions of the same frequency from the other station,

In Omega no two stations transmit the same frequency at the same time. This is essential because, at the receiver, the reception of two such signals of the same frequency simultaneously would simply sound like one and the phase information would be a combination of the two rather than the phase information of either one. Accordingly, the switching as defined is necessary and Omega meets this limitation.

### Clause 4.

and the transmissions being distinctively altered periodically for synchronizing switching means at the receiver with the switching of the transmissions and

In the Omega pattern, the respective CW segments have slightly different durations which are coded for the purpose of synchronizing switching means in the receiver. This is clearly a periodic "distinctive alteration," in the sense intended in '816.

### Clause 5.

wherein the receiver comprises means for receiving the radiated signals,

Omega obviously has this.

### Clause 6.

switching means which are synchronized by the distinctive alteration in transmission and which are arranged to separate the received signals from the two transmitters,

Both of the accused receivers have switching means at the receiver synchronized to the transmission pattern. The switching is done by "gating" and by circuit sequencing in the computer, controlled by a clock in the computer, which routes the digital phase information of the separately received signals to the appropriate storage locations in the core.

### Clause 7.

and a phase difference indicator for indicating the difference in time of propagation which indicator has a recurrence cycle of time difference indication equal, in seconds, to the reciprocal of the fundamental frequency,

The "recurrence cycle of time difference indication equal, in seconds, to the reciprocal of the fundamental" refers to the fact that the "zone" in which lane identification is feasible is 1f wide, and beyond that distance the 1f phase difference indication, upon which the lane identification depends, repeats itself and is therefore ambiguous. The lane identification in both the ARN–99 and BRN–7 answers to this same definition. The two accused receivers are capable of resolving lanes to a maximum of ± 36 n.m., but only when all three frequencies from two stations are being received. The readout provides both the whole number of the lane (good to within ± 36 n.m.) and the fractional part within an 8 n.m. lane as a decimal number (to the right of the decimal point). This also corresponds to the published Omega charts which are set up to emphasize every ninth 10.2 lane, i. e., a zone of 72 n.m. width on the base line.

### Clause 8.

said indicator being operated by a fine control and a coarse control,

In Omega, the "raw" LOP is developed by a direct phase comparison between the 9f signals from two different stations. Such a comparison, however, only gives the "percent of lane" figure, i. e., the numbers to the right of the decimal point on the display. The numbers to the left of the decimal point are developed by the frequen-

cy differencing mode to resolve the lane. The only effect of the frequency differencing mode is to develop the whole number of the lane, and in this sense (as in the '816), it is a "course control," while the percentage of lane is the "fine control."

*Clause 9.*

said fine control being dependent on a pair of signals derived from locally generated non-interrupted signals, one of which is phase-controlled by only one of the signals received from said first station and the other by only one of the signals received from said second station

In the accused Omega receivers, the "fine" LOP readout of the fractional position within a 9f or 10.2 khz. lane is derived from phase-comparing a 10.2 khz. signal from each of two stations. The way this is done is first by receiving the signals sequentially. When each comes in it is phase-compared to a local oscillator and its phase difference is extracted therefrom and converted to a pulse train representing the digital value of the phase difference. This pulse train is a "locally generated signal" and it is then fed to the computer and stored in the form of discrete magnetized areas in the memory core. In this form it is in a continuously available status. Thus, in the accused receivers, the phase information is effectively a "locally generated non-interrupted signal." Of course, the signal is up-dated periodically, as it must be in any system in which the receiver is moving. But the signal is "non-interrupted" in the sense intended by the patent in that it is continuously available for comparison to provide a "fine" indication whenever the operator calls for a raw LOP readout. Thus, in the accused receivers the fine control for the readout of the position in a 10.2 khz. lane is derived from locally generated non-interrupted signals from two stations. But for the fact that it is done digitally in the accused receivers and analog in the '816, the two systems are identical.

*Clause 10.*

and the coarse control being dependent on six received signals derived from the three different frequencies transmitted from each of the stations.

The accused receivers go into the "frequency difference" mode to resolve lanes and all three frequencies from two stations are needed to resolve the lane to a "zone" width of 72 n.m. by the frequency differencing and phase comparison techniques described in finding 18.

20. Claim 4 is as follows:

A hyperbolic radio navigation system as claimed in claim 1 wherein, at each station, the various different frequencies are radiated in sequence.

There is no doubt that the Omega signals are radiated in sequence.

21. Claim 11 is as follows:

A hyperbolic radio navigation system as claimed in claim 1 wherein there is provided a third transmitting station radiating signals satisfying the respective phase conditions given in radians of angle, $n_1\omega_0 t + a_1 + k_1$, $n_2\omega_0 t + a_2 + k_1$ and $(n_1 + 1)\omega_0 t + a_3 + k_1$ where $k_1$ is a constant, the transmissions being switched in sequence such that the signals of each frequency are transmitted from one station during intervals of the transmissions of the same frequency from the other stations, and wherein the receiver is provided with two of said phase difference indicators, one indicator being arranged to indicate the difference in time of propagation of signals from the first and the second stations and the other being arranged to indicate the difference in time of propagation of signals from the first and third stations.

By using three stations, the Omega receivers are able to display a pair of LOPs from which a position fix can be obtained.

22. (a) Under terms of an agreement, Norway acquired the land for the transmitter site at Bratland at no cost to defendant. The United States supplied, at no cost to Norway:

(a) All necessary electronic, communications and monitoring equipment.

(b) Technical assistance for installation and initial operation.

**1098**

(c) Design information for construction of the station.

Title to all the equipment rests in the United States, but Norway retains sovereignty over the transmitter site. In addition, the station was to be operated by personnel designated by Norway, but trained at U.S. expense. The entire cost of construction, operation and maintenance of the station was to be at U.S. expense. Norway was to be responsible for ensuring continuous operation of the station in phase with the world-wide Omega complex. The U.S. was to bear all costs and expenses for any claims resulting from operation of the station, including any legal expenses and any settlements. In fact, defendant was responsible for synchronization management of the Norway station at least during its first months of operation.

(b) The United States is also paying for the construction of the stations in Argentina and Liberia but not for the stations in La Reunion or Japan. However, defendant is supplying the equipment, without cost, at least to Japan, and title to that equipment is to remain in the United States.

(c) Operation of the Omega transmitter in Norway was initiated by flying an atomic clock to the transmitter to establish phase synchronization. Thereafter, the operation has continued under monitoring control from the United States. The foreign transmitter sends out the Omega signals according to the Omega format previously established by defendant. The United States is the sole controlling and guiding force behind Omega.

### CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 1, 4 and 11 of U.S. Patent No. 2,844,816 are valid and infringed. The amount of recovery to which plaintiff is entitled as reasonable and entire compensation shall be determined in further proceedings pursuant to Rule 131(c)(2).