52 CCPA

## Application of Myron PANTZER and Milton Feier.

### Patent Appeal No. 7176.

United States Court of Customs and Patent Appeals.
Feb. 11, 1965.
Rehearing Denied May 5, 1965.

A. A. Orlinger, New York City, for appellants.

Clarence W. Moore, Washington, D. C., (J. E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

KIRKPATRICK, Judge.

The appellants have appealed the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 9 and 11 to 17 in their application Serial No. 579,137, filed April 19, 1956, entitled "Therapeutic Solutions," as unpatentable over the prior art. No claim is allowed.

Claim 9 is illustrative and reads as follows:

"9. A solution of methetharimide in excess of one-half of one percent and up to its maximum solubility in a member of the class consisting of propylene glycol, a liquid polyethylene glycol, a solution of any of these glycols with one another, and a solution of at least one of these individual glycols with an amount of water up to about ten percent of the total solution; said solution being physiologically innocuous on internal administration as well as by injection, and the methetharimide dissolved therein being stable against hydrolysis, said solution being in therapy a barbiturate antagonist."

Claims 11 and 12 call for a solution of methetharimide in propylene glycol in various concentrations. Claims 13 to 15 call for a solution of methetharimide in various liquid polyethylene glycols. Claim 16 is limited to a solution of methetharimide in propylene glycol and liquid polyethylene glycol. Claim 17 calls for a solution of methetharimide in propylene glycol and water, the amount of water present being up to ten percent of the weight of solution.

According to the specification, methetharimide has been used as a barbiturate

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

antagonist [1] and is administered in about the same quantity as the barbiturate to be overcome. For this use, methetharimide has been prepared as a saturated solution in water or physiological saline but its solubility therein is limited to 0.5%. Administration of methetharimide by intramuscular or intravenous injection thus required an excessive amount of liquid. Moreover, it was found that the aqueous solution lost effectiveness due to hydrolysis of the methetharimide. Appellants state that they have found that methetharimide is more soluble in the glycols than in water and that the glycols protect the antagonist against hydrolysis.

The references relied on by the examiner and the board are:

I. G. Farben (Br.) 384,176 Dec. 1, 1932.

Jour. Am. Phar. Assoc. (1) July 1939, Vol. 28, No. 7, pgs. 416–421 (i. e. Dumez article).

Jour. Am. Phar. Assoc. (2) May 1955, Vol. 44, No. 5, pgs. 296–301 (i. e. Bodin & Taub article).

Jour. Am. Phar. Assoc. (3) Jan. 1952, Vol. XLI, No. 1, pgs. 27–29 (i. e. Carpenter et al. article).

The Lancet, Jan. 22, 1955, Vol. 268, page 181.

Koppanyi, "Antioxidant and Stabilizing Action of Propylene Glycol," Federation Proceedings, Vol. 9, Mar. 1950, pgs. 291 and 292.

U. S. Dispensatory, 24th Ed., J. B. Lippincott Co., Philadelphia, 1947, page 940.

The Lancet article shows methetharimide as a barbiturate antagonist administered intravenously. Although the article does not indicate what solvent was

utilized, appellants and the board have proceeded on the assumption that the solvent was a physiological saline solution.[2] We shall do likewise.

Bodin et al. disclose polyethylene glycol as a solvent for barbiturate salts. The instability of the salts, due to hydrolysis in aqueous solutions, is alleviated by the use of that glycol as a stabilizing solvent.

Koppanyi, Dumez, U. S. Dispensatory, and the British patent disclose propylene glycol as a solvent for various medical preparations, vitamins and drugs, including barbiturates and barbiturate salts. Dumez and the British patent place the barbiturate or barbiturate salt, respectively, in anhydrous propylene glycol to form solutions which have sufficient stability to permit of sterilization and which protect the barbiturate material against hydrolysis previously encountered with aqueous solutions.

The examiner and the board regarded Carpenter et al. as cumulative and discussion of that reference here, beyond what appears below, is unnecessary.

The examiner rejected claims 9 and 13–16 as unpatentable over Lancet in view of Bodin et al., and claims 9, 11, 12, 16 and 17 as unpatentable over Lancet in view of any one of Dumez, Koppanyi, U. S. Dispensatory, or the British specification. The examiner's position is that, since the secondary references teach the use of polyethylene glycol or propylene glycol as a solvent for medicinals in general and barbiturates or barbiturate salts in particular to alleviate problems encountered with hydrolysis of the barbiturate materials in aqueous solution, it would "not involve invention" to use the glycols as a solvent for the methetharimide of Lancet. The examiner states that, since "it is well known in the phar-

---

1. Appellants in their brief characterize barbiturate antagonists as preparations which, when injected into a subject who is in a state of unconsciousness produced by administration of barbiturates in overdose or in surgery, restore the subject to a state of light anesthesia, from which recovery to full consciousness later occurs.

2. Lancet incorporates by reference a paper by "Shaw et al. in press." That a paper, appearing in British Medical Journal, May 1955, at pages 1238 to 1240, shows methetharimide to have been administered in physiological saline at a concentration of 0.5%.

maceutical art that methetharimide is structurally very similar to the barbiturates which are shown to be stabilized by the glycols in the art of record * * * it would be obvious to one skilled in the art to try the glycols (in the place of water) as solvents for the methetharimide * * *."

The board affirmed, seeing nothing unreasonable in the examiner's conclusion that methetharimide would be expected to be soluble in glycols in view of art showing solubility of barbiturates in glycols. The board added, "Chemists are well aware that chemical structure has a bearing on solubility and that compounds of similar structure are, in general, soluble in the same solvents." [3]

 Appellants contend that the examiner's position that " * * * it would be obvious to one skilled in the art *to try* the glycols (in the place of water) as solvents for the methetharimide * * *" is contrary to 35 U.S.C. § 103 as well as our decision in In re Huellmantel, 324 F.2d 998, 51 CCPA 845, wherein we said:

"We feel compelled to comment on the Patent Office analysis by which patentability under 35 U.S.C. § 103 is herein determined. The examiner concedes that appellant's composition 'shows improved results.' The board accepts this as 'fact,' but con-

cludes it is immaterial since 'it is obvious *to at least try*' (our emphasis) to substitute one steroid for another in the prior art composition.

"We believe this reasoning, insofar as it negates consideration of properties in determining obviousness under section 103, flys in the face of the plain language of the statute * * *. Section 103 says, inter alia, 'The subject matter as a whole would have been obvious * * *." Nothing is said about 'obvious *to try*.' Consideration of the subject matter 'as a whole' in chemical cases requires comparison of properties, pharmaceutical or otherwise, as well as comparison of chemical structures.

"We do not mean to imply that every variance in property of a new compound or composition will tip the balance for patentability where otherwise closely related compounds or compositions are involved. However, all relevant property differences *must be considered* in the light of the facts of each case in the determination of statutory obviousness."

We agree with the appellants that the issue of obviousness in this case can be resolved only after considering the differences between the prior art and the

---

**3.** The board acknowledged three literature references of record, two cited by the examiner and one cited by appellants, as recognizing that methetharimide is similar in structure to barbiturates. For example, the British Medical Journal (footnote 2, supra) shows the following chemical structures for barbiturates and methetharimide:

5,5 disubstituted
barbiturate

β,β-methyl, ethyl-
glutarimide

---

and says, "The chemical structure of * * * [methetharimide] indicates a

definite resemblance to the barbiturate ring system."

claimed compositions in view of their pharmacological and chemical properties. To do so, we consider the cited references and what we believe they teach one of ordinary skill in the art.

Although the phrasing of the rejection by the examiner perhaps leaves something to be desired, our study of the record does not convince us that the examiner or the board failed to give proper consideration to the "subject matter as a whole" in determining obviousness under 35 U.S.C. § 103. In this regard, the appellants have set forth in their claims certain properties of the methetharimide solution which we believe both warranted and received full consideration in the proceedings below. Those properties are:

(1) "said solution being physiologically innocuous on internal administration as well as by injection",

(2) "the methetharimide dissolved therein being stable against hydrolysis",

(3) "said solution being in therapy a barbiturate antagonist."

We find no reason in the record why the claimed solution would not be expected to be "physiologically innocuous" or harmless to the processes and activities of the living organism. Although the appellants contend that the Lampe reference [4] cited by them in their brief before the board contraindicates obviousness of the claimed solutions, other references relied on by the examiner, notably British (propylene glycol is "physiologically relatively inactive when injected into the tissue"), U. S. Dispensatory ("The available evidence points to the lack of toxicity of propylene glycol"), Carpenter (polyethylene glycols have a "low order of toxicity"), Bodin ("The relative safety of the polyethylene glycols as solvents for parenteral solutions has been established through extensive toxicological and physiological studies * * *"), Lancet ("Shaw states that * * * [methetharimide] is quite innocuous"), are far more persuasive that the "physiologically innocuous" property set forth here is indeed obvious and expected.

Appellants concede in their brief that the prior art was aware that methetharimide in aqueous physiological saline solution hydrolyzed and lost effectiveness.[5] It would appear self-evident that elimination of water and utilization of a nonaqueous solvent would solve this problem. The means by which similar stability problems with other hydrolyzable drugs were eliminated was well known in the art prior to appellant's invention, as is apparent from a consideration of Dumez ("Propylene glycol is * * * used to prepare anhydrous solutions of the barbiturates of sufficient stability to permit of sterilization"), British (" * * * The alkali metal salts of the barbituric acids * * * are rather unstable in the presence of water; * * * they undergo chemical decompositions, probably by hydrolysis. * * * The present invention is based on the discovery that by dissolving the alkali metal salts of barbituric acids in glycols, in the absence of water, stable and sterilizable solutions are obtained * * *"), or Carpenter et al. (" * * * increasing concentrations of * * * [polyethylene glycol 400] have the effect of increasing the stability of pentobarbital sodium"). Clearly the characteristic of stability against hydrolysis of the claimed solutions is both obvious and expected from the references of record.

4. Lampe et al., Journal of the American Pharmaceutical Association, Vol. 42, page 445, July 1953, notes that the literature regards propylene glycol as relatively free of toxicity. It was found, however, that propylene glycol used as a vehicle for a drug produced convulsions in mice. The article concludes " * * * Although it is apparently justifiable to use propylene glycol as a solvent for oral administration in humans without regard to toxicity, * * * (p)ropylene glycol appears *not to be a suitable choice as a* solvent in toxicity studies * * * in mice."

5. The brief refers to British Medical Journal, footnote 2, supra.

The appellants further argue that the Patent Office disregarded Lampe's teaching that the "central activity" (effect on the central nervous system) of propylene glycol warrants "more thorough investigation" since experiments showed the glycol to depress the central nervous system of mice in a manner analogous to the barbiturates. Thus, the appellants contend that, in administering the solution of barbiturate antagonist in propylene glycol to overcome the effects of barbiturate narcosis, one would expect the depressant action of barbiturate and glycol to be cumulative, with the end result that the solution has less effect, in therapy, as a barbiturate antagonist.

We believe Lampe et al. to be inconclusive support for the appellants' position. The board appropriately noted the doubt cast upon the usefulness of propylene glycol as a vehicle by the appellants and added "However, appellants are claiming this glycol and it is not shown that the objection to its use * * * is obviated in appellants' composition employing propylene glycol."

The appellants point out that no reference shows methetharimide in anything but water, no reference shows any homolog or isomer of methetharimide dissolved in anything, and that they believe it is unobvious that the propylene and polyethylene glycols will serve to dissolve methetharimide. The appellants' position appears to be that one must be able to predict with certainty that those glycols will dissolve methetharimide before the rejection is proper here.

■■ However, as we pointed out in In re Moreton, 288 F.2d 940, 48 CCPA 928, obviousness does not require absolute predictability. Where, as here, the knowledge of the prior art clearly suggests that the use of glycols as solvents in place of water to form solutions of methetharimide stable against hydrolysis would be successful, the mere possibility of failure does not render their successful use unobvious. In other words, an invention can be said to be obvious if one ordinarily skilled in the art would consider that it was logical to anticipate with a high degree of probability that a trial of it would be successful.

Subsequent to the decision of the board, the appellants filed a petition for reconsideration accompanied by an affidavit and five exhibits. The board considered the arguments in the petition under Rule 197 but refused to consider the showings submitted under Rule 195. A further request for reconsideration was denied under Rule 197(b). A petition to the Commissioner of Patents, requesting direction to the board to admit and consider these matters, was also denied. Appellants allege error in the actions of the board and the Commissioner.

■■ The question presented is one of Patent Office practice, and this court will not disturb the rulings of the Patent Office in the absence of a showing of clear error. In re Dalton, 188 F.2d 170, 38 CCPA 953; In re Patrick, 189 F.2d 614, 38 CCPA 1105; In re Gartner, 223 F.2d 502, 42 CCPA 1022; In re Bourdon, 240 F.2d 358, 44 CCPA 740. We are of the opinion no such clear error has been shown. Accordingly, since the affidavit and exhibits were not considered by the board, they will not be considered here.

The decision of the board is affirmed.

Affirmed.