55 CCPA

**Application of Jack E. CAVENEY.**

**Patent Appeal No. 7780.**

United States Court of Customs and Patent Appeals.

Nov. 24, 1967.

Petherbridge, O'Neill & Aubel, Chicago, Ill. (Roy E. Petherbridge, Chicago, Ill., of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

RICH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals,[1] adhered to on reconsideration, affirming the examiner's final rejection of claims 1, 5, 6, 8, and 10–14 of application serial No. 325,203, filed November 13, 1963, entitled "Wiring Duct." No claim has been allowed.

The wiring duct of the invention is depicted in Fig. 1.

Fig.1

It is chiefly characterized by the flat fingers 6 which are solid pieces the width of which is several times greater than the thickness. The construction makes the fingers quite flexible in the lateral direction, permitting easy and convenient insertion of the wires into the slots 8. It also ensures rigidity in the longitudinal direction, allegedly preventing accidental removal of the wires, once inserted. Each finger is enlarged at its free end so that the open ends of the slots 8 are too constricted for passage of the wires. Wires can be inserted only by lateral deflection of the fingers as shown at 17 in dotted lines.

Claim 1 is illustrative.

1. A channel-shaped wiring duct, formed of a base and two upstanding sidewalls separated into ribbon-like deflectable fingers, for conveying elec-

1. Consisting of McCann and Kreek, Examiners-in-Chief, and Angel, Acting Examiner-in-Chief. Examiner-in-Chief McCann wrote the opinions.

trical wire conductors along a predetermined path and allowing distribution of the conductors to a plurality of locations along such path by the lateral deflection of selected ones of said fingers out of the planes of the sidewalls, each of said sidewalls being made of flat thin-walled nonconductive material and having a plurality of parallel slits for receiving the wire conductors, the slits extending from the free edge of the sidewalls toward said base to divide the sidewalls into a plurality of solid ribbon-shaped fingers, side edges on each of said fingers which are substantially parallel throughout the major portion of the finger length, the width of each ribbon-shaped finger in the plane of its sidewall being less than the finger length but several times greater than the finger thickness as measured in a plane transverse to the plane of its sidewall, each of said fingers being substantially rigid to displacement in the plane of its sidewall but exhibiting a leaf-spring action so as to be readily deflectable laterally out of the plane of its sidewall to accommodate the insertion of the conductors into said slits and their removal therefrom, a projection in the plane of the sidewall extending from at least one of the parallel edges of each finger near its free end, a succession of restricted throats formed by said projections each located at the entrance of one of the slits, said projections serving to tend to block the passage of wire conductors having a diameter larger than the throat width until an adjacent finger is deflected laterally out of the plane of its sidewall.

The examiner cited the following patents:[2]

| Cruser | 2,082,099 | June 1, 1937 |
|--------|-----------|--------------|
| Walch  | 3,024,301 | Mar. 6, 1962 |
|        |           | (filed 10–5–55) |

Walch describes the wiring support shown below. Slots 22 are formed between flexible wire loops 17.

Fig. 1.

Walch discloses that his loops prevent accidental displacement:

In accordance with my invention, the arms 17 are so located that the distance between adjacent loop portions 20 is less than the diameter of the circuit wires in the bundle. As a result, the circuit wires are effectively retained in the space 22 and prevented from being accidentally displaced therefrom during the wiring operation. The segments 19 have a moderate degree of resilience so that wires leading off from the bundle can be slipped be-

2. The examiner also cited in his final rejection the periodical Electrical Manufacturing for March 1953, p. 150. A subsequent amendment, however, makes discussion of that reference unnecessary.

tween the loop portions 20 and into the space 22 if sufficient force is applied to the wire to displace the loops, or if the loops are otherwise displaced. Permitting the wires to enter the space 22 in this manner is especially advantageous in that it obviates the need for threading wires through the opening, which, as previously stated, is a tedious, time-consuming process. Threading is also disadvantageous because it tends to abrade the insulation of the circuit wires.

The Walch patent and a parent of the application on appeal were in an interference. Walch was awarded priority.

Cruser shows wire supports in his Figs. 4 and 5, reproduced below, the throats (E, El, E2) of which do not inhibit removal or insertion of wiring as do those of Walch or appellant.

The examiner rejected appellant's claims as obvious within the meaning of 35 U.S.C. § 103 in view of Walch and Cruser:

> To form the fingers * * * of Walch * * * of solid cross section as suggested by Cruser in Figure 5 would be obvious. Cruser teaches that the sidewalls through which the wire emerge[s] may be formed of wire loops (Fig. 4) or solid cross section (Fig. 5). In view of this teaching of Cruser, it is submitted that it would be obvious to form the fingers of Walch of solid cross section. Walch clearly discloses * * * that his loops 20 prevent accidental displacement of the wires during the wiring operation. Thus, if there is any difference in the hold power of the fingers defined in the appealed claims, it is a difference in degree rather than kind.

Appellant submitted his own affidavit and that of one of his customers attesting to the unobviousness and commercial success of his invention. The affidavits describe the methods of wiring control panels before appellant's invention. These included the "flat wiring" method in which the electrical wire conductors were routed to have a minimum of crossovers and to lie flat beside each other on a supporting surface, the "bundling" method in which the wires were gathered together in a bundle and laced with twine, and the method of running wires along troughs or raceways and threading the wires through holes in the troughs. The disadvantages of each of these are outlined. Appellant's affidavit, for instance, stated:

> * * * in the "flat wiring" method a large amount of space was needed to position the wires and the initial position of the wires had to be carefully planned to assure a minimum number of crossovers, and if one or more wires were incorrectly routed a total rearrangement of the wire routing was often necessary. In the "bundling" method the lacing could not be done until the entire wiring operation was completed, and bundles of loose wires were difficult to work with. When using the troughs, the wires had to be threaded through the holes in the troughs and the insertion and removal of the wires was time consuming.

Commercial acceptance was described as almost immediate. Appellant listed sales data for the first three years in which his invention was marketed:

| 1956 | (9 months) | $ 14,800 |
| 1957 | (full year) | $ 99,000 |
| 1958 | (full year) | $170,000 |

Both customer and appellant gave as their opinion that the references of record did not make the invention obvious.

Appellant also introduced the affidavit of Walch,[3] the inventor of the principal reference. Walch recounts that his thoughts, during the development of his wiring support, did indeed touch lightly on the use of solid fingers, but, being cognizant of a number of disadvantages associated with solid fingers, he refused to be distracted from his open-work grill. He further averred:

> THAT, prior to the time of filing my application I was aware of Cruser patent No. 2,082,099, and that I could see no reason to alter or modify the structure of my application in view of Cruser; * * *.

The examiner seemed to feel that the opinions on unobviousness in each of the affidavits could safely be ignored. He dismissed the evidence of commercial success with the shibboleth that such evidence may be used only to resolve a doubt about patentability and not to create one.

The board generally agreed with the examiner, adding only the comments that the Walch affidavit did not allege any knowledge of the Cruser *disclosure* and that all of the affidavits had been considered as evidence of unobviousness but were surely not conclusive on the point.[4]

Appellant's argument is twofold. He argues first that Walch is not a proper prior art reference. He must, of course, recognize that the Walch filing date is earlier than his own. But he bases his argument on the fact that he is *able* to prove a date of invention earlier than the Walch filing date. However, he did not do so.[5] Appellant feels he should be excused from making his proof since, in this case, it would have been futile. The Patent Office, appellant argues, would merely have cited the line of cases holding the disclosure of the prevailing patent[6] to be prior art

---

3. The Walch patent which had been assigned to the General Electric Company was subsequently purchased by appellant.

4. Appellant criticizes the consideration of his affidavits. The board's evaluation of them was sound. We need not, therefore, disturb the rejection on that account.

5. Appellant does point to certain allegations in the affidavits referred to above which purportedly show appellant's earlier date of invention. There is no argument that these even colorably comply with Rule 131 of the Patent Office Rules of Practice. Appellant has also submitted other affidavits with an application which is a continuation of the one on appeal. For our convenience he has included copies of these in his brief in this appeal. We, of course, decline to consider Rule 131 affidavits which are not a part of the record. 35 U.S.C. § 144; see In re Pantzer, 341 F.2d 121, 52 CCPA 1135 (1965); In re Phillips, 315 F.2d 943, 50 CCPA 1223 (1963).

6. Under our cases this may have been quite proper until In re Risse, 378 F.2d 948, 54 CCPA —— (1966). In *Risse*, we decided that only the interference count was *properly prior art against the losing party*. Appellant also relies on *Risse* to show the unavailability of the Walch reference. We note that the examiner's Answer contained this statement:

> The appellant's copending application Serial No. 569,159, of which this instant application is a continuation, was in an interference with the application of Walch, the prevailing party, from which matured the Walch patent No. 3,024,301. The count of such interference is now claim 5 of the Walch patent and such claim 5 of Walch is not limited to sidewalls having any particular construction. From this point of view, appellant's claims 1, 5, 6, 8 and 10–14 are not patentable over Walch's claim 5 taken with Cruser under 35 U.S.C. 103. It would be obvious to make the sidewalls of Walch's claim 5 of solid cross section as sug-

against the losing party and would have ignored whatever affidavits he submitted. In appellant's opinion, the Patent Office would have been correct in so doing until the Supreme Court, in Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965), forbade the use of any patent as prior art *until* its filing date.

■ This case must be decided on the record appellant chose to make. He has, in effect, asked us to reverse the Board of Appeals for an error he assures us it would have made had he only given it the opportunity. Our jurisdiction does not extend so far. The Walch reference is good prior art even under appellant's view of *Hazeltine*.

We do not mean to imply that we see any merit in appellant's analysis of *Hazeltine*. The Court there examined the interplay between sections 102(e) and 103 of the patent statute and determined that, for the purposes of section 103, a patent is effective as a prior art reference as of its filing date. There was no issue before the Court on the effect of an interference on the subsequent prosecution of the losing party's application. We reject the notion that the law in this area was in any way affected.[7]

■ Appellant's secondary line of argument concedes the applicability of the Walch reference but finds the invention patentable nonetheless. We cannot agree.

The only operative difference between the Walch structure and appellant's invention is in the latter's solid fingers. The Cruser showing of the interchangeability of solid and loop finger construction, in what is at least a closely related

art, provides strong support for the obviousness rejection. While we agree with appellant that there are distinctions between Cruser's device and his invention, we do not see that they make the rejection less tenable.

■ Appellant, however, insists that his affidavits attesting to the unobviousness and commercial success of his invention have not been given their proper weight. Our earlier allusion to the efficacy of opinion affidavits on unobviousness is, we believe, sufficient for that point. We do think that appellant's commercial success should not have been brushed aside without a careful analysis of its relevancy.

The role of commercial success in the general plan of the 1952 Act has recently been commented upon by the Supreme Court:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, (1966).

---

gested by Cruser (Fig. 5) as explained above.

Appellant's reply observed:

> The Examiner has now apparently stated a new ground of rejection of claims 1, 5, 6, 8 and 10–14; that is, that the foregoing claims are unpatentable over Walch's claim 5 taken with Cruser under 35 U.S.C. 103.

We think it clear that there is no *Risse* issue in this case. The reference is available under § 102(e). Even if it were not, *Risse* would not help appellant since a rejection on the interference count is in the record.

7. Appellant does not appear to argue that *Risse* and *Hazeltine* are inconsistent. We would assume, then, that he accepts the propriety of the rejection on the interference count. See note 6, supra.

In short, commercial success may be looked to in those circumstances in which it may fairly be an indication of the obviousness or nonobviousness of the invention. In such cases, the Court observed, the subtests of nonobviousness, commercial success and long felt need,

> * * * do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of judicial treatment than are the highly technical facts often present in patent litigation. * * Such inquiries may lend a helping hand to the judiciary which, as Mr. Justice Frankfurter observed, is most illfitted to discharge the technological duties cast upon it by patent legislation. * * * They may also serve to "guard against slipping into use of hindsight," * * * and to resist the temptation to read into the prior art the teachings of the invention in issue.

Id. at 35–36, 86 S.Ct. at 703.

■ Utilization of any of these aids, however, must inevitably await the initial establishment of a nexus between the subtest and nonobviousness. In the *Graham* case, the Supreme Court found that unsuccessful attempts to solve the problem with which one of the patents in issue dealt were "wholly relevant" when these attempts were made before Livingston, an important reference, became available to the art. In this case, we find an analogous situation. The main issue is whether the Walch reference would have made appellant's invention obvious to one of ordinary skill in the art. But appellant's invention was a *commercial success before the Walch* disclosure was actually available to the trade. Therefore, the failure of those in the trade to make appellant's invention in no way bears on its nonobviousness in view of Walch.

It is also worth noting that the affidavits of Luc and appellant list advantages in the use of the invention as quicker and cheaper installation, easier insertion and location of the wires in the duct, easier removal of the wires whenever necessary and better holding against accidental removal.

Luc summarizes:

> THAT, the CAVENEY DUCT with SOLID FINGERS possessed many of the advantages of the Walch open finger grille and, in addition, affords easy insertion of the wiring while preventing such accidental removal of the wiring; * * *.

Appellant's affidavit also states:

> THAT, since the Walch patent was a valuable contribution to the art and covered the CAVENEY DUCT that I was selling, I purchased this Walch patent from the assignee, the General Electric Company, and now own the Walch patent under which General Electric Company reserved a nonexclusive license.

In short, the Walch duct has all but one of the four or five listed advantages of appellant's invention. The duct which has enjoyed such commercial success embodies the Walch invention as well as appellant's. It seems to us that appellant's commercial success may well be due to those features of his ducts which are covered by the Walch patent and for which priority was awarded Walch. Commercial success, in such circumstances, is no indication of patentability *over* the Walch device.

The decision of the board is affirmed.

Affirmed.